This is an appeal from the Forrest County Chancery Court from a final judgment entered on March 16, 1989. The appellant, *Page 1259 
Rebecca Cenac, entered into a "Contract For Deed" as the purchaser of a little country store in McLaurin, Mississippi, and the Murrys, appellees, were the sellers.
Soon after the Cenacs moved into the store and took over the business from the Murrys, severe problems emerged between the parties. Eventually, the Cenacs filed a complaint in the Forrest County Chancery Court wherein they sought rescission of the contract. In sum, the Cenacs wanted to undo the deal that they had made with the Murrys and be returned to their pre-contract status. The case proceeded to trial in the Forrest County Chancery Court. At the end of trial, the chancellor made a bench ruling wherein he denied the Cenacs any substantive relief. On March 16, 1989, the lower court entered a "judgment" wherein the prior bench opinion was adopted as the Final Judgment of the chancery court.
Feeling aggrieved, the Cenacs have now appealed to this Court alleging error by the court below and seeking the same relief that was denied in the lower court. After a careful review of this unusual and interesting case, we find that the lower court did not err in declining to grant the requested relief of rescission of the contract. However, we do find that the Cenacs have clearly proved that the Murrys breached the covenant of good faith inherent in every contract in our law. Consequently, we reverse the final judgment and remand the case to the Forrest County Chancery Court with instruction to the lower court to conduct a hearing in order to determine the appropriate measure of damages for the Cenacs, along with an allowance of reasonable attorney's fees and punitive damages.
The facts of this case are voluminous, yet crucial to the issues which we resolve. We begin with a detailed explanation of the procedural history which has brought us this far followed by the pertinent facts.
 I. PROCEDURAL HISTORY
Rebecca L. Cenac, a Mississippi native, and her husband, Norman Cenac, were residents of Houma, Louisiana, who enjoyed camping in Mississippi at the Paul B. Johnson State Park in Forrest County. From time to time the Cenacs had discussed retiring in Mississippi and buying a little country store somewhere in close proximity to the park. However, the Cenacs acted on their plans prior to reaching retirement age. Norman Cenac worked offshore in the oil business, and in the mid 1980s when the bottom dropped out of the petroleum economy, the Cenacs had an immediate need to find another more stable source of income. Consequently, the Cenacs entered the market to purchase a country store. After making a few contacts in the area, the Cenacs met Carl and Shirley Murry, who owned a country store and bait shop near the park in McLaurin, Mississippi. When approached by the Cenacs, the Murrys were "nice as pie" and seemed interested in selling their store. Negotiations ensued, and eventually a deal was struck. The Cenacs proceeded with plans to buy the store, and they moved to Mississippi. Little did the Cenacs know that it was a deal that they would soon regret.
On June 11, 1986, Carl Wesley Murry, Sr., and Shirley Ann Murry, husband and wife, entered into an agreement with Rebecca L. Cenac. Norman Cenac was not a party to the agreement. Rather than executing and delivering a deed to Mrs. Cenac secured with a deed of trust in the Murrys' favor along with a promissory note, the parties entered into a "Contract For Deed," which is much like a conditional sales contract. Mrs. Cenac paid the Murrys $30,000.00 as a down payment for the store, with a balance of $70,000.00 to be paid in monthly installments of $925.00 per month for the next ten years at 10% interest. The Murrys, as sellers, agreed that, if Mrs. Cenac made all of the monthly notes, they would convey title of the store to her by way of a warranty deed. Therefore, a deed to the store and property was not to pass from seller to buyer until the end of ten years, 1996, once all of the payment obligations under the contract had been fulfilled by Mrs. Cenac.
The contract also contained the following forfeiture clause which "speaks" for itself: *Page 1260 
 4. In case of the failure of the purchaser to make any of the payments herein designated, or any part thereof, or failure to perform any of the other covenants contained in this agreement, this agreement shall be forfeited and terminated within ten days after receipt of notice by the sellers of their intent to deem this contract breached, and should the same occur, all payments on this contract shall be retained by the sellers as due or accumulated rent on the property, and should a default occur, the purchaser hereby agrees that she will vacate the premises immediately upon request by the sellers, and the sellers may take possession of the premises without being liable for any action therefor and without the necessity of any legal. (sic) Further, the purchaser shall not destroy, damage or substantially change waste. If default does occur in this contract, the purchaser agrees that she will return said property in substantially the same condition as when she took control of said property if she will preserve said property and maintain said property.
Additionally, Mrs. Cenac, as purchaser, agreed to pay all the property taxes on the store and to retain hazard insurance from the date of the contract until the property was either conveyed or the contract forfeited. In the contract, the Murrys promised that they would not go into the convenience store, grocery store, gas business, or similar business within a ten-mile radius of the property being "purchased."
A final clause in the agreement stated that, if the purchaser chose not to exercise her right to purchase, the contract would become null and void, and all rights of the purchaser would be forfeited and terminated. All money and other consideration paid by the purchaser to the seller would be retained by the sellers free of any claim from the purchaser, it being agreed that such sums constitute a reasonable rental fee for the property and a reasonable sum as liquidated damages to the sellers if the right to purchase were not exercised.
On December 10, 1987, approximately 18 months after executing the contract, Mrs. Cenac filed a complaint in the Forrest County Chancery Court against Carl Wesley Murry, Sr., and Shirley Ann Murry. In her lawsuit, Mrs. Cenac alleged willful misrepresentation, tortious misconduct, and business interference. Mrs. Cenac sought cancellation and rescission of the contract, a refund of all sums paid, as well as actual and punitive damages. In the complaint, Mrs. Cenac alleged that Carl Murry falsely represented that the roof of the store was sound and would not leak; that the store property was "half an acre" when in reality it was only .297 acre; and that Carl Murry had disrupted septic service to the store. Regarding interference with business relations, Mrs. Cenac alleged that Mr. Murry had engaged in a course of interference and intimidation coupled with bizarre and aberrant behavior directed at the Cenac's family as part of a premeditated design to force a forfeiture and recover the store.
Specifically, Mrs. Cenac requested the following relief in her suit:
 (1) Rescinding and cancelling the contract for deed in exchange for the defendants' payment to plaintiff of all sums received from plaintiff pursuant to said contract;
 (2) Temporarily and permanently restraining and enjoining the defendant Carl Wesley Murry, Sr., from his acts of threats, harassment, business interference and intimidation;
 (3) Ordering the defendants to pay to the plaintiff reasonable attorney's fees of plaintiff's attorney in this behalf expended;
 (4) Directing the restoration of septic tank service to the subject property; and
 (5) Awarding the plaintiff $100,000.00 punitive damages against the defendant, Carl W. Murry, Sr.
As this litigation developed, Mrs. Cenac's husband, Norman Cenac, was added as a party plaintiff by agreed order of the parties in January of 1988. As one might expect in a case such as this, there is tremendous rancor and spite between the parties. Although this record is not very clear, it appears that there was at least one hearing for temporary relief held in the *Page 1261 
chancery court prior to hearing on the merits of Mrs. Cenac's complaint. On January 29, 1989, Chancellor Patterson entered an order for temporary relief wherein it was ordered that the Cenacs and the Murrys shall be permitted exclusive occupancy and enjoyment of their respective property, free from any verbal or physical harassment, intimidation, threats, or physical force by the opposite parties, and that no such party shall engage in any activity directed toward any of the other parties. On May 19, 1989, the Cenacs filed a petition for citation for contempt against Carl Murry in which they alleged that Murry had violated the terms of the prior temporary order. The Murrys live in a house which is next door to the Cenacs' store, and the Cenacs live in a mobile home which is situated on the store property. The store property and the Murry's residence and yard share a common boundary.
This matter finally proceeded to a hearing on the Cenacs' complaint and requested relief in March of 1989. The judgment entered by the lower court merely adopted the bench opinion as the "Final Judgment" with one minor exception. Prior to the trial, the parties reached an agreement concerning the correct legal description of the store property, and the judgment ordered the Murrys to convey to the Cenacs an appropriate instrument correcting the land description in the "Contract For Deed." In the bench opinion, the chancellor denied all relief requested by the Cenacs with little explanation. The bench opinion recited the following reason for denying relief:
 In short, I can find no cause, legal cause, or grounds to rescind the contract for any misrepresentation at the time of its execution.
Therefore, the Cenacs succeeded with only one item of their complaint, getting the land description in the contract corrected.
Now, Mr. and Mrs. Cenac have appealed to this Court, and they have raised a number of points which they deem to be error. Essentially, the Cenacs request on appeal the same relief which they requested in the trial court. The Cenacs have stated their grievances as follows:
The Chancellor erred in the following respects:
 (1) Excluding the uncontradicted evidence of a deliberate course of harassment, misrepresentation, and intimidation by the Murrys as a basis for rescission;
 (2) Failing to find as a matter of law that the Murrys had breached their implied obligations not to impair Mrs. Cenac's performance of her contract;
 (3) Failing to rescind the contract;
 (4) Failing to find that filing of suit was necessary to compel the Murrys to correct and reform the subject land description and failure to award costs and attorney's fees therefor;
 (5) Failing to allow prior payments to be considered as liquidated damages and refunded to the Cenacs;
 (6) Failing to award punitive damages and attorney's fees, and
 (7) Failing to find Carl Wesley Murry, Sr., in contempt for violation of the temporary injunction.
Some of the points raised by the Cenacs were not briefed. However, in due course this opinion will address all valid concerns raised by the Cenacs.
 II. FACTUAL BACKGROUND
Twelve witnesses testified at the trial of this case. These facts will contain a summary of the pertinent testimony as it relates to the issues which we consider.
Rebecca Cenac, plaintiff, has been married for more than 30 years to Norman Cenac, and they have three children, Latina Page and Sherie Carlos, who are two grown daughters with families of their own, and Ryan Cenac, who was 14 years old at the time of trial. The eldest daughter, Latina Page, and her husband, Clayton, moved from Louisiana with the Cenacs back in 1986. Since the Cenacs did not have a home in Mississippi, they purchased a mobile home and parked it adjacent to the store.
According to Mrs. Cenac, Murry represented to her in negotiations that the store property was one-half acre. However, *Page 1262 
Mrs. Cenac acknowledged that when she went to sign the Contract For Deed, Murry's attorney, Lindsey Carter, stated to Mrs. Cenac that the description did not appear to be correct. After the contract was signed, the Cenacs employed a surveyor, and it was determined that the acreage was only .297 acre. When the Cenacs solicited Murry's help in correcting the legal description in the contract, Murry refused to cooperate.
Mrs. Cenac testified Murry represented that he was leaving $52,000.00-$55,000.00 worth of wholesale inventory for the Cenac's benefit when they took over the store. However, the true amount ended up being approximately $39,000.00. Although Murry informed Mrs. Cenac that she was buying the store "as is," Murry also represented that the roof of the store did not leak. This proved to be false. On two occasions after the Cenacs opened the store, they filed claims with their insurance carrier for damage caused by a leaking roof. The Cenacs had to eventually replace the old roof of the store with a new one. Since the Cenacs were new to the store business, Murry agreed that he would train the Cenacs for 30 days, but Murry reneged on this promise.
Murry lived next door to the store which he owned, and both the store and his house shared a common septic tank. Murry told the Cenacs that he would leave the septic tank service as it was. In other words, the Cenacs could continue using the septic tank for the store just as Murry himself had used it. Later, Murry disconnected the store from the septic tank when the Cenacs took a brief out of town trip. Consequently, the Cenacs were forced to install their own septic tank service for the store.
Mrs. Cenac's testimony centered on the bizarre and aberrant behavior of Carl Murry which he has exhibited toward her family since they bought the store. One of Murry's "favorite" activities is to roam shirtless in the front yard while making ape-like motions such as hitting and beating his chest. All the while, Murry engages in a boisterous "ho, ho, ho" laughter which has become his trademark. The store has only one telephone, which is a pay phone located on the front porch of the store. Whenever a member of the Cenac family is on the telephone, Murry sometimes walks to the fence and listens in on the conversation. On other occasions, Murry picks up an instrument and bangs on a nearby satellite dish in his back yard so that no one can hear what is being said. On one occasion, Murry left a dead cat on the property line for an entire day. According to Mrs. Cenac, the cat was as close to the property line as it could possibly be and still be inside of Murry's yard. Another "favorite" activity of Murry is to videotape the Cenacs.
 Q. What, if anything, have you observed with Mr. Murry in the use of the video camera?
 A. Well, that is what he started doing when he started harassing us. He videod us all the time. He lurked around the store videoing. He came around our trailers. He videod us at our trailers where we lived. He'd come out — if I bought ice from anybody he'd come out with his video. He videod — one day I sold my camper to a lady. He opened the screen door.
 Q. Screen door of what?
 A. His home. He put his tripod in there. He videod. He videod the whole thing — moving out and everything. The girl said, `What's he doing?' I said, `He's harassing us. He does it all the time.'
Mrs. Cenac testified about threats that Murry had made on her family, and the insecurity that she felt:
 Q. Mrs. Cenac, what threats, if any, have been communicated to you or to anyone else in your family in your presence and hearing by Mr. Murry?
 A. One day I was out in the yard with my daughter, and I heard him say: `I'm going to get them. I'm going to get them all. I'm going to get them all.'
 Q. Where was he standing?
 A. He was in his yard. He does everything in his yard. *Page 1263 
 Q. And how far were you and your daughter from him?
 A. We was in front of the store. He said it loud, `I'm going to get them all,' just like that to scare us.
On another occasion, Murry came running out of his house firing a pistol as Mrs. Cenac and her daughter were leaving the store in their car:
 A. [H]e's shot guns at my daughter and I.
 Q. What was that circumstance?
 A. We got in the car and leaving the store. We were driving down the road. He comes running out like an ape as usual with a coat on. Now, mind you, 24 degrees sometimes he's out with no shirt, but always with a pistol in his back pocket. But this night — this time he had on a jacket. And he comes running out in front of our car, so I turned and I went down the road. No sooner than I got down the road, I heard pow, pow, pow, pow. My employee heard it. She saw him, too. Saw him running out.
Another of Murry's activities is to stand across the street from the store in a church yard and laugh at the Cenacs:
 A. Well, he'd been across the street on the church yard watching me through the picture window. He was doing that. He'd go over there and he'd ho, ho, ho, ho, ho from over there so I could see him. And then when the mailman came he'd come running up to the mail — up to the truck.
Although the postal service delivers mail only once a day, Murry makes frequent trips to the mailbox so that he can observe and laugh at the Cenacs:
 Oh, he goes to the mailbox all day. All day. The mail runs once a day. And he goes all day. So he can laugh all the way back. I have a window, and he can look that way, and he laughs. He don't even open it sometimes. He goes at night, too.
At one point, Mrs. Cenac injured her foot, and she had to get about with the help of crutches. Murry took the opportunity to mock her by hopping to the mailbox pretending that he was crippled.
Mrs. Cenac also testified that Carl Murry and his wife Shirley would get into their vehicle and drive ever so slowly down the road. All the while, Murry would be looking over at the store laughing. They would pass by the Cenac's store and trailer; and then, on the way back, they would switch sides so Carl could be on the side facing the store. Murry would lurk in an empty house across the street and call out to her family. According to Mrs. Cenac, Murry would call out to her husband, "Norman, better say your rosary." Mrs. Cenac testified that it could be 11:00 p.m. and Murry would be walking down the road by their trailer, laughing, "ho, ho, ho, ho, ho." Additionally, Murry is prone to talking to himself while he is out in the yard. It is also Murry's custom to follow Mrs. Cenac with his headlights on. Mrs. Cenac described an occasion when Murry followed her home from the grocery store. Murry drove in the driveway with his headlights on, and he got out of the truck hollering "coonies, too many coonies on this hill."
One of the more intense episodes with Carl Murry involved an emergency situation when Mrs. Cenac's daughter, Latina Page, locked herself out of her mobile home when she walked outside. Mrs. Page's one year old twins were in the trailer, and the stove in the kitchen was on. Mrs. Cenac described the incident at trial:
 A. I've never been through anything like this. Okay. I looked out the window, and I saw my daughter running. She was running to the store as hard as she could, and I knew right away something had happened at the house. She has twins. They are a year old, and she was hollering, Mama, Mama, I locked the door. My babies are in the house and I've got the stove on, and she said hurry up and call Clayton. Clayton works at Martin Motors. That's my son-in-law. She said he's got the keys. He's got to come out here. So we *Page 1264 
run through the store. She gets on the phone, and she calls Clayton, and tells him the babies are locked in the house, hurry, please hurry. I've got the fire on in the trailer. So we run to the car. But while she's on the phone, he [Murry] starts that ho, ho, ho, ho, ho. He's always watering. He'll water for hours in one spot. Just all day long and at night, too. And he started laughing.
Mrs. Page directed some insulting comments to Murry when he laughed at her predicament. Stemming from this incident, Murry called the local law enforcement and had Mrs. Page and Mrs. Cenac arrested. Murry alleged that Mrs. Page pointed a gun at him and that Mrs. Cenac cursed him. In any event, Murry was responsible for procuring their arrest on some misdemeanor charges. Apparently, Mrs. Page was arrested for "pointing and aiming, profanity, and simple assault." Mrs. Cenac was arrested for "profanity." At trial, both Page and Cenac as well as Dorothy Semenak, a store customer, categorically denied that Page had a gun. Although Norman Cenac had returned to offshore work, he was at home at the time getting some rest. Mr. Cenac went to the jail to bail out his wife and daughter. Mrs. Cenac described her arrest:
 A. Okay. They [law officers] stayed maybe a couple of hours, and then when they came back it's not long after that the constable came, came into the store and said they had a warrant for my arrest and a warrant for Latina's arrest. I hurried up and called Nina Watts because she's my employee now, and I couldn't reach her. I had to call Latina to get a baby sitter. She had twins, it's not easy. So they had to wait until, you know, we could make arrangements. My husband had just come in about 4:00 o'clock that morning from work. He was asleep. I had to call him and tell him that I had to go to the jail.
 Q. What did you do with the store?
 A. I closed it until I could get back. I knew it probably wouldn't take long so I closed it.
 Q. And how many hours were you and Latina in jail?
 A. We didn't go to the jail. We went up there but no one put us behind bars. It must have been about two hours. I couldn't believe it. I had come back to my home state to get arrested. I've never had a speeding ticket.
For the most part, Murry conducts his activities within the boundaries of his own property, the public street, or the church yard. For example, one of the photographs which was introduced into evidence showed where Murry had piled up a line of garbage just within his own property line to mark the boundary between himself and the Cenacs. However, on a few occasions, Murry has come upon the Cenac's property to carry out his activities:
 Q. Mrs. Cenac, when you were living in the camper by the store, what experience did you have with intrusion on your privacy?
 A. One night I went out to our camper. Latina went with me, and Ryan went with me. We just sit out there. We talk. We were looking at some pictures because I hadn't moved everything out yet. I still had some pictures so we were sitting there watching pictures. It was getting dark. He comes out with a flashlight, and he starts flashing up in the windows. It's irritating. With his flashlight. The next thing we knew, there he was standing at the window looking in at us. On our property. He thinks he can do you any way. Just any way, and get by with it.
Of particular importance in this appeal is the impact that Murry has had on the Cenac's volume of business. Mrs. Cenac testified that as customers would come and go from the store, Murry would call customers over to the fence and talk with them. *Page 1265 
 Q. What observation, if any, do you have concerning his contact with your customers?
 A. He's always talking to them since the law suit. He calls them to the fence. Hollers at them. The other day one of my old customers came up to me, and he was talking to me. One of my regular customers, and he starts saying: `Chopper's got a girlfriend. Chopper's got a girlfriend.' Things like that. He did that in front of him, but most of the time he don't cut up when there's customers there, he acts like a friendly, wonderful person.
Mrs. Cenac testified that she had experienced a dramatic decrease in customer volume due to the antics of Carl Murry:
 Q. Since you've been at the store, what's been your experience in retaining customers?
 A. Well, at first we were doing really good. You know, our customers stayed with us, you know. His old customers stayed with us and everything. And then after he started harassing us, when he left for Gloster it was wonderful. It was great. But when he come back, he started harassing us and threatening us and all that, laughing and walking by the store. Him and his wife. She gets out there right with him and laughs. She does everything like he does. Well, I lost some of my customers.
According to Mrs. Cenac, she had lost several customers since she took over the store and Murry began his antics. She testified that business volume had dropped. At the trial, Mrs. Cenac presented two customer lists which were marked for identification only. Plaintiff's exhibit number 22 consisted of approximately 20 casual customers that Mrs. Cenac allegedly lost. Plaintiff's exhibit number 23 consisted of approximately 20 additional names who were charge book customers who no longer traded at the store. The trial judge allowed these two exhibits to be marked foridentification only. Mrs. Cenac testified as follows:
 Q. And what do you attribute the loss of these customers?
 A. Well, I think a lot of it is because of our problems with Mr. Murry. They just don't want to get involved.
The trial court did not allow the customer lists to be admitted as evidence because Mrs. Cenac's testimony that she lost these customers because of the Murrys was simply speculation.
At the trial, the Cenacs presented evidence of only one customer who stated that he no longer patronized the store because of Murry. Billy Dale Brewer testified that he no longer traded with the Cenacs because he didn't want to be bothered by Carl Murry next door. Mr. Brewer also testified that after the Cenacs took over the store, Murry bragged that he would get the store back in three months. According to Brewer, Murry referred to the Cenacs as, "them turkeys." Likewise, Johnny Anderson testified that he heard Murry make the statement that he was getting the store back regardless. According to Anderson, Murry stated that if he didn't get the store back, he was going to "whip everybody's ass on the hill." Mary Murry, Carl Murry's sister-in-law, testified that she remembered the day when the Murrys closed the deal on the store. On this day, Murry received in hand the down payment of $30,000.00, and Murry remarked to family members that he was also "getting the store back, too."
According to Mrs. Cenac, she and her husband were in financial dire straits. Mr. Cenac had to go back to work in the oil field business once work became available. According to Mrs. Cenac, she had to use all their personal savings to pay bills and keep the store going. Additionally, money had to be borrowed from Trustmark Bank and family members just to keep afloat. Mrs. Cenac testified, "Mr. Murry told us that we could make a living out of the store which has not happened at all. Due to losing a lot of customers due to his harassment. This man has just about run me nuts." Significantly, despite the harassment and intimidation, the Cenacs have not missed any monthly payments on the store. They *Page 1266 
have never been in default of their $925.00 monthly obligation under the contract.
Sherie Carlos, the Cenacs youngest daughter, testified that when she visited her mother and father in Mississippi, Murry constantly videotaped and laughed at her family. According to Ms. Carlos, her mother and father had aged 20 years since they moved back to Mississippi and met Carl Murry. Mrs. Carlos testified that Ryan, her 14 year old brother, was extremely upset and wanted to move back to Louisiana, with some of the family who still lived there.
According to Ryan, Murry calls him names such as "Wimp, Punk, Coon-ass," and "other words I'd rather not say." Ryan testified that on three or four occasions, Murry has followed his school bus down every road. Although Murry's daughter also rode the bus, Murry would wave to Ryan. On one occasion, Murry called Ryan when he got in from school. Ryan testified about the telephone call, and he identified the voice as that of Carl Murry's:
 Q. And what telephone calls, if any, have you had from him?
 A. One night, I had just got home from my sister's house, and I walked in the door, and the phone was ringing, and I caught the phone, and he said, `I seen you today at school, and I'll see you again tomorrow.'
Murry has invited Ryan to fight him, and Ryan stated that the distractions caused by Carl Murry were having an adverse effect on his concentration at school. Ryan stated that Murry is constantly laughing at him or banging on something out in the yard just to make noise.
Norman Cenac testified that Carl and Shirley Murry were "nice as pie" when they were negotiating to buy the store. Carl and Shirley furnished all of their bookkeeping records to illustrate how much the store was making, profit and loss statements, total sales, sales tax paid, etc. Actual net profit in 1984 and 1985 was approximately $49,000.00.
Mr. Cenac testified that Murry has made repeated threats that he [Murry] was going to ruin him, and Murry is constantly videotaping the store and his family. According to Norman Cenac, Murry has constantly harassed him:
 That man ever since he moved back in his house has been video-ing my store. And he goes around telling people he's just leasing it to me. I thought I was buying the thing and he has gone around telling people that he was going to get the store back. That's why we're over here today. But he video-ed us every Sunday. I don't know why on Sunday, and every day of the week he had his video on his front porch, and in his living room video-ing all day and night. And another thing at night, every night, that we close that store down, there was that man and his wife right there as close as they could get to the store, just right next to the fence making racket and noise. Noise like a piece of pipe about three foot long, just running up and down the cyclone fence at night. I'm talking about eight or nine o'clock at night. I'm trying to close the store down, you know, and I could hear them justa giggling and laughing. That's what I'm talking about. The man has harassed me to death, and I really don't need it.
One night Norman Cenac was in the store closing down the business, and he looked outside and saw Carl Murry standing over the fuel cap of the gasoline tanks. Murry was in front of the store backing the cap off the gas tank. Murry heard Cenac in the store, and he shot off in the dark down the street. Cenac went outside to investigate and called out to Murry, "What's going on, Carl. What about this gas?" Murry appeared from the dark. Murry had discarded the gloves, but he was carrying a .357 magnum in his left hand. Murry's story was that he was sitting on his porch and noticed that it appeared the gasoline cap was about to come off the fuel tank, so he came over as a good Samaritan to tighten the cap.
Cenac testified that at times he would sweep off the front porch, and Murry *Page 1267 
would be in his yard making gorilla-type motions.
 Anytime I walk up to that store on the porch, anytime my kids, my wife, anybody walks up on that store, you hear that ho, ho, ho, ho, ho. I'm sick of it. I just can't stand it anymore. That giggling. That funny stuff. You know, you just can't make a living at anything like that. That man went around telling everybody he was getting the store back and the judge, right here, wanted him to buy it back. I'll give him a fair price for it. He don't want to buy it back. He wants me to lose it to him.
Another favorite thing for Murry to do is to invite Norman Cenac to fight him. Murry makes repeated threats to Mr. Cenac. According to Cenac, Murry said, "I'll fix your goddam ass where you are never going to need another damn lawyer never. He was just as mad as fire as he could be." Another Carl Murry antic is to call the house or the store telephone, and as soon as someone answers, hang up. According to Mr. Cenac, he's done that over and over and over. Cenac had a tracer placed on his telephone to document the harassing calls:
 I've got a tracer on my home, and I've got records over here of calls that he made to my store. I answered the phone, and what he wanted to know was about Anita's Roofing Company. There's no such thing as Anita Roofing Company. And I've got it over here. And another thing, he's done it to my house. Called on Thanksgiving Day I don't know how many times from early in the morning. Just as soon as my wife or my kid would pick up the phone, they'd hang up. Just ring and hang up over and over and over. Just harassment. Just harass everybody to death around the store, around the house. You can't have any peace around there with him.
Finally, Mr. Cenac testified that Murry ran off their former employee, Ludie Bell Dixon. "She has never been around that store since Carl rushed in there and told her she better get her ass out of there now."
Dorothy Lynn Semenak testified that she often walks to the store. On her walks to the store she has observed Carl Murry in the middle of the street talking to himself while holding a video camera on his shoulder aimed at the Cenac's store and trailer. According to Mrs. Semenak, Murry talks to his video camera as he is filming people. "He was talking to it," (referring to the video camera).
Clayton Page, the Cenac's son-in-law, corroborated existing testimony that Murry laughs and snickers and does his "ho, ho, ho" routine when he is not videotaping around the store. "I've been in the store a lot of time when people came in, and they wanted to know who was that guy out there laughing and hollering and beating on things and stuff like that, and a-giggling. . . ."
Carl Wesley Murry, Sr., 46 years old, 270 pounds, testified and denied virtually everything alleged against him. Murry denied that he videotaped the Cenacs and the customers who came and went from the store. He denied laughing at the Cenacs on a repeated basis. On the witness stand, Murry categorically denied making any harassing telephone calls or threats against the Cenacs or their children. Murry did not recall having an agreement with the Cenacs which allowed the Cenacs to continue to use the septic tank which was shared by both the store and the Murry's residence. Murry alleged that the septic tank eventually began to overflow; therefore, Murry took it upon himself to disconnect the store from the septic tank. The denials were constant. Murry denied that he ever banged on his satellite dish while Mrs. Cenac was on the telephone trying to talk. According to Murry, the only time he ever banged on his satellite dish was when he tried to tighten a loose screw, which was just one occasion. Murry did admit that on one occasion he fired a .38 calibre pistol in his yard. Murry's story was that a dog had pinned down a turkey in his back yard, and consequently he fired a pistol at the dog. Murry stated that he constructed a barrier of garbage on the property line between the Cenac's store and his residence *Page 1268 
as a temporary barrier until he could find something more permanent. His explanation was that he was trying to prevent delivery trucks from rolling over into his property and breaking water lines that were in the area.
Murry testified that he received an undesirable discharge from the United States Armed Forces in the late 1950's, and he acknowledged that he was convicted of disturbing the peace in December of 1959. According to Murry, in 1965 he "served time" in the State Mental Hospital in Whitfield, which allegedly was his penalty for a DUI offense. When pressed on cross-examination, Murry also acknowledged having two prior convictions for burglary and one conviction for hunting deer out of season.
 DISCUSSION
This opinion will examine; (1.) tortious interference with contract (performance of a contract); (2) tortious interference with business relations or interference with prospective advantage; (3) covenant of good faith and fair dealing inherent in every contract.
 III. TORTIOUS INTERFERENCE WITH CONTRACT (PERFORMANCE OF A CONTRACT)
The appropriate place to begin our discussion is to correctly define tortious interference with performance of a contract and to understand how this differs from tortious interference with business relations. In the past, the evolving case law of this state has used these terms interchangeably. See Galloway v. TheTravelers Insurance Company, 515 So.2d 678 (Miss. 1987);Protective Service Life Insurance Company v. Carter,445 So.2d 215 (Miss. 1983); Irby v. Citizens National Bank of Meridian,239 Miss. 64, 121 So.2d 118 (1960). As this opinion will demonstrate, there is a distinction with a difference. Fundamentally, it is one thing for a wrongdoer to cause another to breach a contract which he or she has with some third person. This is tortious interference with performance of a contract. Yet, it is quite another thing when a wrongdoer unlawfully diverts prospective customers away from one's business thereby "encouraging" customers to trade with another. This is tortious interference with business relations or sometimes referred to as interference with prospective advantage, which will be examined in part IV.
The tort of interference with performance of a contract is one which has been recognized in Mississippi since at least 1959 beginning with Bailey v. Richards, 236 Miss. 523, 111 So.2d 402
(1959). Judge Tom S. Lee in Liston v. Home Insurance Company,659 F. Supp. 276, 280 (S.D. 1986), described the tort of wrongful interference with contract:
 One who intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for pecuniary loss resulting to the other from the failure of the third person to perform the contract.
See Mid-Continent Telephone Corp. v. Home Telephone Company,319 F. Supp. 1176, 1199-1200 (N.D.Miss. 1970), which defined the tort as follows:
 An action for interference with contract will ordinarily lie when a defendant maliciously interferes with a valid and enforceable contract, thereby causing one party not to perform and resulting in injury to the other contracting party. Malice in this context is the intentional doing of a harmful act without justification or excuse, or stated differently, the wilful violation of a known right.
The four elements of tortious interference with contract are as follows:
 1. that the acts were intentional and willful;
 2. that they were calculated to cause damage to the plaintiffs in their lawful business;
 3. that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the *Page 1269 
part of the defendant (which constitutes malice); and
 4. that actual damage and loss resulted.
Liston v. Home Insurance Company, 659 F. Supp. 276, 281 (S.D.Miss. 1986), citing Protective Service Life Insurance Co.v. Carter, 445 So.2d 215, 216-17 (Miss. 1983); Irby v. CitizensNational Bank of Meridian, 239 Miss. 64, 121 So.2d 118, 119 (1960).
While at first glance the elements of the tort appear to fit the proof presented at trial, under the facts of this case, tortious interference with contract is unavailable as a theory for relief. As Judge Lee noted in Liston v. Home InsuranceCompany, 659 F. Supp. 276, 280 (S.D.Miss. 1986), a cause of action exists by a party to a contract against some third, outside person who causes the party not to perform. Thus, in order to pursue a cause of action, it is accepted that the wrongdoer is a "stranger" to the contract which was interfered with — an outsider. "A party to a contract cannot be charged with interfering with his own contract." Knight v. Sharif,875 F.2d 516, 526 (5th Cir. 1989); Martin v. Texaco, Inc., 304 F. Supp. 498
(S.D.Miss. 1969); Liston v. Home Insurance Company,659 F. Supp. 276 (S.D.Miss. 1986); See Cranford v. Shelton,378 So.2d 652, 655 (Miss. 1980) ("If one maliciously interferes in a contract between two parties, and induces one of them to break that contract to the injury of the other, the party injured can maintain an action against the wrongdoer."). As the tort of interference with contract has evolved, it is settled that, "[a] defendant's breach of his own contract with the plaintiff is of course not a basis of the tort." Prosser Keeton, The Law ofTorts, § 129, 990 (5th ed. 1984). Therefore, tortious interference with performance of a contract is unavailable as a theory of relief for the Cenacs in that the wrongdoer (Murry) is also a party to the contract.
 IV. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS INTERFERENCE WITH PROSPECTIVE ADVANTAGE
This tort was first recognized in the 1910 case of Wesley v.Native Lumber Co., 97 Miss. 814, 53 So. 346 (1910). This early case referred to the tort as "malicious injury to business." InWesley, the appellant was a merchant and barber in the Harrison County town of Howison. Logically, Wesley's customers were citizens of Harrison County who resided in and around the town of Howison. Thomas A. Gause, manager of the Native Lumber Company located in Howison, forbade his employees from patronizing Wesley's store and threatened discharge for those who disobeyed his order. Some employees ignored the order and continued to trade with Wesley; and, true to his word, Gause discharged them. Wesley alleged that lost profit from the loss of lumber company employee customers amounted to at least $9.00 per week. Wesley,
97 Miss. at 816, 53 So. at 346.
Finding that no action at law existed, the lower court dismissed Wesley's suit, and appeal was taken to this Court. Finding that a cause of action did exist against Native Lumber Company, this Court reversed and remanded for a trial:
 [T]his court has set at rest in this state the question whether an act, legal in itself, may become illegal, and a ground of action, when accompanied with the malicious purpose to injure the business of another, resulting in such injury — holding the affirmative . . . It is true a person has the right to refuse to have business relations with any person whomsoever, whether his refusal is the result of caprice or malice, without laying himself liable to action therefor; but he cannot from such motives, influence others to the same course, for the purpose of injuring the business of such other. The act and the accompanying motive together constitute the unlawful act.
Wesley v. Native Lumber Company, 97 Miss. 814, 820, 53 So. 346, 347 (1910).
Although this state's case law concerning this tort is indeed sparse, by 1940 this tort had found a solid place in our jurisprudence. In Memphis Steam Laundry-Cleaners, Inc. v.Lindsey, 192 Miss. 224, 5 So.2d 227 (1941), the issues focused on unfair competition and trade, but this Court *Page 1270 
noted that a cause of action exists against one who sets about to maliciously and wantonly injure a competitor. This Court quoted from Wesley and remarked that a cause of action exists where one with a malicious purpose sets about to injure the business of another, and injury does result. "The act and the accompanying motive together constitute the unlawful act." Memphis SteamLaundry-Cleaners, Inc. v. Lindsey, 192 Miss. 224, 239,5 So.2d 227, 232 (1941). See Bailey v. Richards, 236 Miss. 523, 536,111 So.2d 402, 407 (1959) ("Wrongful or malicious interference with the formation of a contract or the right to pursue a lawful business, calling, trade, or occupation has been generally held to constitute a tort.").
Since Mississippi's experience with the tort of wrongful interference with business relations (prospective advantage) is limited, resort to a secondary source is required for a better understanding of its application. We refer to Prosser and Keetonon Torts, 5th ed.
 Tort liability for interference with prospective advantage seems to have developed at a very early date in cases having to do with the use of physical violence, or threats of it, to drive away customers from the plaintiff's market, or those who might make donations to his church; but it seems to have been limited rather definitely to the use of such improper means. During the seventeenth and eighteenth centuries there were decisions involving threats and violence to frighten away prospective workmen or customers, and later there were others which gave an action for spiteful shooting to scare off the plaintiff's game. . . . The real source of the modern law, however, may be said to be the case of Temperton v. Russell, in which the Court of Queen's Bench declared that the principles of liability for interference with contract extended beyond existing contractual relations, and that a similar action would lie for interference with relations which were merely prospective or potential.
 * * * * * *
 For the most part, the `expectancies' thus protected have been those of future contractual relations, such as the prospect of obtaining employment or employees, or the opportunity of obtaining customers. In such cases there is a background of business experience on the basis of which it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered. . ..
 * * * * * *
 With intent to interfere as the usual basis of the action, the cases have turned almost entirely upon the defendant's motive or purpose, and the means by which he has sought to accomplish it. As in the cases of interference with contract, any manner of intentional invasion of the plaintiff's interests may be sufficient if the purpose is not a proper one.
Apart from this, however, the means adopted may be unlawful in themselves; and violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith, all have been held to result in liability, and there is some authority which limits liability to such cases.
 Most of the decisions, however, have turned upon the defendant's motive or purpose. Again, as in the case of interference with contract, the defendant has been held liable if the reason underlying his interference is purely a malevolent one, and a desire to do harm to the plaintiff for its own sake. . . .
 * * * * * *
 Quite apart from any improper motive, unfair competition, or for that matter other interferences with prospects, can be found when the defendant engages in any conduct that amounts to a recognized tort and when that tort deprives the plaintiff of customers or other prospects. Liability for such losses may be imposed for defamation, disparagement, intimidation or harassment of the plaintiff's customers or employees, obstruction of the means of access to his *Page 1271 
place of business, threats of groundless suits,
commercial bribery and inducing employees to commit sabotage.
Prosser Keeton, The Law of Torts, § 130, 1005-1014 (5th ed. 1984) (emphasis added).
In summary, a cause of action exists where one engages in some act with a malicious intent to interfere and injure the business of another, and injury does in fact result. This is the sum and substance of Wesley v. Native Lumber Company, 97 Miss. 814, 53 So. 346 (1910). Therefore, the essential elements of this tort are somewhat different from tortious interference with contract. The remedy for the tort is damages, and the plaintiff must also show (1) a loss, and (2) that defendant's conduct caused the loss. Prosser Keeton, The Law of Torts, § 130, 141 (5th ed. Supp. 1988).
Without question, the Cenacs properly pleaded a cause of action for tortious interference with business relations. Paragraph nine of the complaint provides as follows:
 9. The Defendant Carl Wesley Murry, Sr. has willfully and continuously engaged in threats, harassment, business interference and intimidation against the Plaintiff and her husband as part of a premeditated design to recover said convenience store and its contents, having stated to Plaintiff's customers that he is `getting the store back.' Other acts of tortious misconduct on the part of the Defendant Carl Wesley Murry, Sr. include telling at least one of Plaintiff's employees that she had `better quit,' refusal to give Plaintiff a payment book with respect to the Contract payments, trespassing on Plaintiff's property at night after the convenience store is closed, maintaining a log of Plaintiff's activities and schedule, referring Plaintiff's customers to other convenience stores, interdicting septic tank service, repeated early morning hang-up telephone calls, loud laughing at Plaintiff's customers and family, filming of Plaintiff's customers and the conduct of Plaintiff's convenience store business, suggesting the probability of a robbery and threatening suits for various specious reasons.
In their complaint, the Cenacs aver (1) malicious acts with an intent to injure their business; (2) caused by Carl Murry; and (3) injury or loss as a result thereof. Indeed, Murry's tactics were textbook examples cited in Prosser Keeton, The Law ofTorts, and included harassment, misrepresentation, intimidation, injurious falsehoods, violence, threats and criminal prosecutions in bad faith. While the Cenacs have cleared the first hurdle in pleading the required elements of the tort, we now turn to the evidence presented at trial to determine if the Cenacs successfully proved their cause of action.
We examine the proof of tortious interference with business relations governed by the understanding that the remedy for the tort is damages. Wesley v. Native Lumber Company, 97 Miss. 814, 53 So. 346 (1910); Prosser Keeton, The Law of Torts, § 130. Prosser and Keeton explain the remedy:
 For the most part, the `expectancies' thus protected have been those of future contractual relations, such as the prospect of obtaining employment or employees, or the opportunity of obtaining customers. In such cases there is a background of business experience on the basis of which it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered. . ..
Prosser Keeton, The Law of Torts, § 130, 1006 (5th ed. 1984).
In addition to proving wrongful interference with a malicious intent to injure the business, the Cenacs had a burden of proof to show the financial loss caused by Murry's aberrant behavior. We readily conclude that the Cenacs met the first requirement. That is, the Cenacs succeeded in showing malicious acts on the part of Murry accompanied with a design to interfere and disrupt the business which they *Page 1272 
purchased with a motive of re-acquiring the store by forcing the Cenacs to default.
Unfortunately, one is constrained to conclude that the Cenacs proved only half of their case. For absent from the record is the "hard proof" of the financial ruin which the Cenacs allege. This loss would be proved by illustrating the store's volume of business and profit while Murry owned the store (or when he was away from McLaurin) compared to the level of business when Murry was present and living next door. On the witness stand, the Cenacs alleged that the customer trade had sharply diminished, but they offered little in the way of hard data to support this contention. There was the testimony of only one witness, Billy Dale Brewer, who stated that he no longer conducted business with the Cenacs because he did not want to endure Carl Murry. While Mrs. Cenac did present two lists of customers who no longer traded at the store, the chancellor did not allow the list into evidence since the list was based on Mrs. Cenac's speculation
that she lost these customers because of Murry. At a minimum, the Cenacs needed some testimony from these former customers to substantiate the Cenacs' claim. While Murry had the store, the bookkeeping was performed by a professional service in town. Assuming that the Cenacs maintain adequate records of the store's business, a comparison of the business volume would not have been difficult.
V. GOOD FAITH AND FAIR DEALING
All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement. Morris v. Macione,546 So.2d 969, 971 (Miss. 1989); UHS-Qualicare v. Gulf CoastCommunity Hospital, 525 So.2d 746, 757 n. 8 (Miss. 1987); BlueCross Blue Shield of Mississippi, Inc. v. Maas, 516 So.2d 495, 498 (Miss. 1987); Perry v. Sears, Roebuck Co.,508 So.2d 1086, 1089 (Miss. 1987); Restatement (Second) of Contracts § 205, 99 (1979). The covenant of good faith and fair dealing in contract has force in the statutory law as well. "Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement." Miss. Code Ann. § 75-1-203
(1972). A leading contracts treatise describes the duty of good faith and fair dealing as follows:
 In recent years, courts have often supplied a term requiring both parties to a contract to exercise what is called `good faith' or sometimes `good faith and fair dealing.' This duty is based on fundamental notions of fairness, and its scope necessarily varies according to the nature of the agreement. Some conduct, such as subterfuge and evasion, clearly violates the duty. However, the duty may not only proscribe undesirable conduct, but may require affirmative action as well. A party may thus be under a duty not only to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of the other party's duty, but also to take some affirmative steps to cooperate in achieving these goals.
Farnsworth, Contracts, § 7.17, 526-27 (1982).
Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness. Restatement (Second) of Contracts § 205, 100 (1979).
The Cenacs devote the major part of their appellate argument to the implied covenant of good faith and fair dealing. The Cenacs argue that Murry has breached the covenant of good faith pointing to Murry's abusive, aberrant, intimidating, harassing behavior which has made their life a living hell. We agree. We trust that the facts of this case establish Murry's breach of the good faith duty and have nothing to add. Murry's motive is clear. With $30,000.00 in hand and $925.00 monthly payments for each month for ten years, Murry would also get the store back, a healthy windfall, if he could only drive the Cenacs out of town forcing a forfeiture of the contract. In addition to Murry's bizarre *Page 1273 
behavior, he clearly misrepresented material facts to the Cenacs when they were negotiating for the "purchase" of the store. Under our standard of review, we can conclude only that the lower court erred in its application of the law to the facts of this case. If the covenant of good faith and fair dealing has no meaning in this case, it has no meaning in any case.
Now we must determine the appropriate remedy for Murry's breach of the good faith duty. "The appropriate remedy for a breach of the duty of good faith also varies with the circumstances." Restatement (Second) of Contracts § 205, 100 (1979). The Cenacs are interested in only one remedy-rescission, or cancellation of the contract with a refund of all sums paid. Rescission is a retroactive remedy and renders a contract unenforceable from the outset. Cancellation, however, is prospective and acts to discharge or excuse remaining obligations under an agreement.Imperial Cas. Indem. v. Sogomonian, 198 Cal.App.3d 169,243 Cal.Rptr. 639, 645 (2d Dist., 3d Div., 1988). The remedy of rescission would place the Cenacs in a pre-contract status and essentially undo the deal which they made with the Murrys. "A `rescission' amounts to the unmaking of a contract, or an undoing of it from the beginning, and not merely a termination . . ." Black's Law Dictionary 1174 (5th ed. 1979).
In the early development of the common law of this state, rescission as a remedy was allowed only in instances of fraud or mistake. Harrison v. Stowers, 1 Walk. 165 (1824); Liddell v.Sims, 9 Smedes M. 596 (1848); Lewis v. Starke, 10 Smedes 
M. 120 (1848). However, it was soon recognized that depending upon the character of the case, damages may be an inadequate remedy and rescission an appropriate remedy for a breach "going to the very substance of the contract." Light, Heat Water Co.of Jackson v. City of Jackson, 73 Miss. 598, 648, 19 So. 771, 774 (1895). In Gulf South Capital Corporation v. Brown,183 So.2d 802, 805 (Miss. 1966), this Court addressed the remedy of rescission and noted,
 As to the character or kind of breach or default warranting rescission, there may be a rescission if there is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats its purpose. 17 Am.Jur.2d Contracts § 504 (1964). Accordingly, where complainants stated that they would not carry out a contract to manufacture boxes at prices stated in the contract, defendant could not be held liable for damages, since complainants had breached a material part of the contract and in effect repudiated it. Mariani v. Hennington, 229 Miss. 212, 90 So.2d 356
(1956), suggestion of error overruled, 229 Miss. 212, 92 So.2d 202 (1957).
Rescission as a remedy has generally tracked the remedy of cancellation or termination in its application and requirements for implementation. That is, the focus is upon the materiality of the breach with the understanding that such a drastic remedy is reserved for "extreme cases" and should be "sparsely granted."Lipsky v. Commonwealth United Corp., 551 F.2d 887, 895 (2d Cir. 1976); UHS-Qualicare v. Gulf Coast Community Hospital,525 So.2d 746, 756 (Miss. 1987). As the Fifth Circuit remarked, "[a]s far as we can tell it has always been the rule in Mississippi that rescission is one of the remedies available to an injured party in the event of a material breach." Olin Corporation v.Central Industries, Inc., 576 F.2d 642, 646 (5th Cir. 1978).See Hensley v. E.R. Carpenter Co., Inc., 633 F.2d 1106, 1110 (5th Cir. 1980) (rescission available only if breach is material or vital).
Our research reveals that in Mississippi, as well as in other jurisdictions, the appropriate remedy for the breach of the covenant of good faith is the measure of expectancy type damages. Each party to a contract has a justified expectation that the other will act in a reasonable manner, and when one party acts outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached.Story v. *Page 1274 City of Bozeman, 242 Mont. 436, 449, 791 P.2d 767, 775 (1990). In an "ordinary" contract situation, a breach of the covenant is a breach of the contract itself, and contract damages are due.Story, 242 Mont. at 449, 791 P.2d at 775.
We think that damages are the appropriate remedy in the instant case. In prior Mississippi cases which address the breach of the covenant of good faith, the appropriate remedy has been one of damages. Planhouse, Inc. v. Breland Farmer Designers,412 So.2d 1164, 1166 (Miss. 1982); Southwest Gas Producing Co., Inc.v. Seale, 191 So.2d 115, 122 (Miss. 1966); Van Zandt v. VanZandt, 227 Miss. 528, 538, 86 So.2d 466, 470 (1956). An allowance of damages should be allowed the Cenacs in this case. The remedy of rescission would be cumbersome for contracts which call for performance over an extended period of time, such as the one at bar. At this point, the Cenacs are in the sixth year of a ten year contract, and we think that equity in this case is served by enforcing the good faith of the agreement which was made. For breaches of the duty of good faith, damages are the favored remedy unless damages are wholly inadequate as a remedy.Southwest Gas Producing Co., Inc. v. Seale, 191 So.2d 115, 122 (Miss. 1966).
As we noted in part IV of this opinion, the record before us is sparse of any hard proof of financial loss caused by the interference and antics of Carl Murry. At trial, Mrs. Cenac had two customer lists which contained names of former patrons who no longer traded at the store. Mrs. Cenac and other witnesses testified that business volume had diminished sharply because of Murry. In fact, there was testimony at trial that business picked up for a short period of time when Murry was living temporarily in Gloster, Mississippi, but when he returned next door, business once again dropped. Believing as we do that the wrongs committed by Murry are deserving of a remedy in this case, we remand this case to the Forrest County Chancery Court for the appropriate determination of damages. Upon remand of the case, the Cenacs will be afforded an opportunity to prove the lost volume of business which they allege. Evidence such as financial statements of the store's operation prior to and since June of 1986, the testimony of former customers, etc. would be relevant as the lower court ascertains the amount by which the Cenac's legitimate expectations have been thwarted by the bad faith exhibited by Murry. While absolute certainty in the proof of damages is not required, reasonable certainty is; and, the measure of recovery cannot be based on pure conjecture or speculation. Strickland v.Rossini, 589 So.2d 1268, 1275 (Miss. 1991); Stephens v. Brock,568 So.2d 702, 704 (Miss. 1990); Wall v. Swilley,562 So.2d 1252, 1256 (Miss. 1990). Further, it goes without saying that the Cenacs bear the burden of proof to prove their damages.
Furthermore, we note with significance that during the pendency of this appeal, both parties have been subject to a permanent injunction. In the bench opinion which the lower court adopted as the final judgment, a temporary order was made permanent. The order mandated that both parties be allowed exclusive enjoyment of their respective properties free from verbal or physical harassment, intimidation, or threats directed against the opposite party. It is our fervent hope that the permanent injunction has been respected and the parties have been in compliance during the pendency of this appeal since the obligation of good faith and fair dealing endures for the life of the contract. Murry's obligation of good faith was not excused by virtue of his success in defending against the complaint in the court below. Rather, the duty of good faith survives the entry of judgment in the court below and continues to this day. Upon remand of this case, the lower court shall make a determination of whether or not the breach of good faith and fair dealing has been ongoing during the pendency of this appeal, which has been more than three years. Should the lower court determine that Murry has honored the good faith cooperation essential to every part of the contract since the entry of judgment in the court below, March of 1989, then the measure of damages would *Page 1275 
include those losses experienced from June of 1986 through mid-March of 1989. However, if the lower court determines that the breach has been an ongoing process throughout the pendency of this appeal and thereafter, then the proper measure of damages would include losses experienced from June of 1986 until such time that the trial court conducts a re-trial. By the same token, if the breach of good faith survived the final judgment in the court below but was cured at some point during the pendency of this appeal, then the appropriate measure of damages would extend from June of 1986 until such time as the lower court determines that the breach was cured. While this instruction to the lower court to determine when, and if, Murry's breach has been cured may be somewhat unusual, this is an unusual case demanding a very tailored remedy.
 VI. ATTORNEY'S FEES AND PUNITIVE DAMAGES
The Cenacs sought punitive damages and attorney's fees which the lower court denied. We find error as to the denial of attorney's fees.
It is well settled that absent statutory authority orcontractual provisions, attorneys' fees cannot be awardedunless punitive damages are also proper. Defenbaugh andCompany of Leland v. Rogers, 543 So.2d 1164, 1167 (Miss. 1989);Central Bank of Mississippi v. Butler, 517 So.2d 507, 512 (Miss. 1988); Grisham v. Hinton, 490 So.2d 1201, 1205 (Miss. 1986); Gardner v. Jones, 464 So.2d 1144, 1150 (Miss. 1985);Aetna Casualty Surety Co. v. Steele, 373 So.2d 797, 801 (Miss. 1979).
We find that the parties did, in fact, contractually bargain for the right to attorney's fees should such be necessary to enforce the contract.
 It is further agreed that if it becomes necessary to insure the performance of the conditions of this Contract and it becomes necessary to employ an attorney, the defaulting party or parties agree to pay reasonable attorney fees and court costs therewith.
Para. 7, Contract For Deed.
Consequently, upon remand the lower court shall make the proper allowance for attorney's fees. See Young v. Huron Smith Oil Co.,Inc., 564 So.2d 36, 40 (Miss. 1990); Carter v. Clegg,557 So.2d 1187, 1192 (Miss. 1990); McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982). Further, the issue of punitive damages may be considered pursuant to the appropriate criteria. See SoutheastBank of Broward, Florida v. I.P. Sarullo Enterprises, Inc.,555 So.2d 704, 712 (Miss. 1989); Central Bank of Mississippi v.Butler, 517 So.2d 507, 512 (Miss. 1987); Tideway Oil ProgramsInc. v. Serio, 431 So.2d 454, 465 (Miss. 1983).
 CONCLUSION
We find that the appellee, Carl Wesley Murry, Sr., has breached the covenant of good faith and fair dealing in this contract. We remand this case to the Forrest County Chancery Court for a hearing to determine the appropriate measure of damages and attorney's fees incurred as a result of Murry's breach in accordance with this opinion. Upon remand, the chancery court may consider the appropriateness vel non of punitive damages.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
PRATHER, J., not participating. *Page 1276