793 So.2d 642 (2000)
Larry BRAIDFOOT, Appellant
v.
WILLIAM CAREY COLLEGE, John Does 1-30, Mississippi Baptist Convention, Barbara Jones, William E. Payne, James W. Edwards, James Guenther, Guenther, Jordan & Rogers, P.C., Bobby Williamson, Larry Patterson, William C. Browning, Ben Carlisle and Bobby Perry, Appellees.
No. 1999-CA-00473-COA.
Court of Appeals of Mississippi.
September 12, 2000.
Rehearing Denied May 8, 2001.
Certiorari Denied August 30, 2001.
*644 David C. Frazier, Pascagoula, Attorney for Appellant.
J. Boyce Holleman, Dean Holleman, Gulfport, Janet McMurtray, Alan W. Perry, Jackson, J. Robert Ramsay, Hattiesburg, Attorneys for Appellees.
BEFORE McMILLIN, C.J., SOUTHWICK, AND MOORE, JJ.
*645 MOORE, J., for the Court:
¶ 1. Appellant Larry Braidfoot appeals a summary judgment granted to Appellees, William Carey College (the College), The Mississippi Baptist Convention (the Convention), James Edwards, Barbara Jones, William Payne, James Guenther, Guenther, Jordan & Rogers P.C., Bobby Williamson, Larry Patterson, William Browning, Ben Carlisle, and Bobby Perry. Braidfoot asserts as reversible error the circuit court's decision to grant the Appellees' motion for summary judgment. Because we have determined that summary judgment was appropriate, we affirm the judgment of the Circuit Court of Forrest County.

I. FACTS
¶ 2. In the summer of 1994, Larry Braidfoot, then Provost of William Carey College, was given a copy of the College's application for a United States Department of Education Title III Strengthening Institution Grant. After reviewing the school's application, Braidfoot questioned James W. Edwards, the president of the College, and William E. Payne, the College's vice-president who was responsible for grant applications, about certain statements and representations included in the application. Dissatisfied with the answers he received about the grant application, Braidfoot confronted Bobby Perry, a member of the College's Board of Trustees. Braidfoot expressed his opinion to Perry that the College had made a number false statements and declarations on its grant application violating federal laws. Specifically, Braidfoot believed that the College falsely represented the existence of established College committees, on some of which he was named a member, that continued to evaluate the needs of the College.
¶ 3. Subsequently, Braidfoot was informed that the College's Board of Trustees had committed to investigate his allegations of fraud and dishonesty by the College's administration. The Board of Trustees appointed several Board members to serve on a committee to investigate the matter. Following the investigation by certain Board members and the College's attorney, James Guenther, it was reported that any misstatements made on the grant application were "immaterial."
¶ 4. By this point, however, the Board of Trustees determined that Braidfoot's relationship with others at the College had deteriorated. Braidfoot, also a licenced attorney, was employed by the College as per an annually Board-renewed contract and was not a tenured employee. In May 1995, after the Board of Trustees determined that the College's progress was perceived as being significantly disrupted and impeded as a result of the differences between Braidfoot and other College administrators, the Board instructed the College's attorney to negotiate with Braidfoot the terms of his leave of absence and termination of his employment. Although Braidfoot's annual contract was set to expire in August of 1995, the Board authorized the College's attorney to continue Braidfoot's salary though August of 1996. Braidfoot responded to the offer in writing including those terms which were objectionable to him, that is, he wanted payment of his attorney's fees, a draft of a letter of recommendation from the College's president, an acknowledgment that his leave was a management decision "he" would accept and other specific terms. In a second memorandum, Braidfoot requested a sabbatical and that he wanted to "formalize" some of the conversations he had had about his leave of absence. Braidfoot also requested expense money, a new laptop computer, a travel allowance and an office to be furnished by the College. Braidfoot negotiated the terms of a *646 release and settlement with the College and signed the final document on May 24, 1995. Among other things, the settlement/release agreement contained the following language
LARRY BRAIDFOOT (hereinafter "Releasor"),... fully, completely and finally remise, release, acquit, discharge, and hold harmless, WILLIAM CAREY COLLEGE, its trustees, president, officers, insurers, successors, designees, representatives, assigns, principals, agents, servants, and employees (hereafter collectively referred to as "Released Parties") of and from any and all claims, demands, actions, causes of action, suits and damages of every kind and nature whatsoever, including, but not limited to, those which he now has or may be able to allege in the future for events occurring prior to the signing of this release instrument.
. . .
Releasor agrees and stipulates that he will not file any civil action or claim which he may now be entitled to file in any court or with any administrative agency, whether federal or state, against Released Parties either directly or indirectly, for any damages, injuries and/or equitable relief of any kind whatsoever, resulting from any matters concerning his employment or the cessation of his employment with Released Parties.
. . .
In executing and delivering this release Releasor relies wholly upon his own judgement, knowledge and belief as to the nature, extent and duration of any damage and/or injuries which he may have suffered or sustained, or may sustain in the future, as a result of the [sic] any events, incidents or occurrences which he has alleged or could have alleged against Released Parties and, as to the questions liability involved, Releasor has had the benefit of legal counsel of his own choosing said counsel having indicated his approval of this Agreement and the execution and delivery of this release by the affixing of his signature hereto, and Releasor further represents and warrants that he has not been influenced by any partnership or corporation hereby released, or by any agent or other person representing Released Parties concerning the nature or extent of his injuries, damages or losses, or legal liability therefor.
After signing the settlement/release agreement, Braidfoot received all compensation and benefits promised by the College.
¶ 5. Subsequently, the United States Department of Justice investigated the College for possible violations of the False Claims Act. In September of 1997, the College negotiated and entered into a settlement with the U.S. government.
¶ 6. Within a week of a press release announcing that a settlement had been reached, Braidfoot filed a complaint against William Carey College, the Mississippi Baptist Convention and a host of other individuals named above alleging breach of fiduciary duties, fraud in the inducement, misrepresentation, breach of contract, and breach of a duty of fair dealing in the release and settlement executed by him and the College. Essentially, Braidfoot asserts that he was forced and coerced to enter into the agreement with the College. Braidfoot claims that the Board of Trustee's investigation into his allegations was influenced by members of the College's administration and that there was a "cover-up" going on by the College administration to hide the false claims it made in obtaining the 1994 federal grant. Braidfoot contends that he has suffered a loss of income and employee benefits causing him great worry, mental distress and emotional anguish as a result of his "retaliatory *647 discharge." He demands past and future pay and economic fringe benefits, $250,000 in compensatory damages for emotional distress and mental anguish, $500,000 in punitive damages and costs and attorney's fees for the litigation.
¶ 7. The Appellees, some collectively, others individually, filed a motion to dismiss or alternatively for summary judgment. After hearing the arguments of counsel, the circuit court entered summary judgment finding, among other things, that no genuine issues of material fact existed as to Braidfoot's allegations of fraud, coercion, misrepresentation or illegal concealment of the facts "which would allow him [Braidfoot] to be excused from the consequences of his execution of the release...." It is from this judgment that Braidfoot appeals.

II. ARGUMENTS OF THE PARTIES

A. Braidfoot
¶ 8. Braidfoot contends that the circuit court erroneously granted the Appellees a summary judgment and asserts that genuine issues of material fact are in dispute as to the validity of the settlement agreement. Particularly, Braidfoot argues: "The misrepresentation and fraud in the inducement caused [him] to rely to his detriment on what was represented to [him] to be an independent investigation [by the Board of Trustees] regarding his concerns about the 1994 Title III Strengthening Institutions Grant Application and investigation; and that but for the assurances given to him by the Appellees that the investigation had been thorough and independent, without being incomplete and manipulated by Edwards and Payne, Braidfoot never would have signed the May 24, 1995 Agreement."
¶ 9. Braidfoot also charges (1) that the trial court committed reversible error and failed to follow the existing standards for the granting of a motion for summary judgment; (2) that the trial court committed reversible error when it ruled that the release executed on May 24, 1995 was binding upon him, and (3) that the trial court committed reversible error in failing to consider the allegations and proof he provided in response to the motions for summary judgment as to the questions of fact regarding fraud in the inducement, misrepresentation, tortious breach of contract, breach of fiduciary duties on the part of the Appellees and his detrimental reliance on the words and actions of the Appellees.
¶ 10. Braidfoot further contends that the Appellees are equitably estopped from relying on the settlement agreement on the grounds that Braidfoot relied to his detriment on the representations made to him by the Appellees regarding the grant application and through the "supposed thorough and independent review made by the executive subcommittee of the College and Board of Trustees." Braidfoot asserts that he suffered a retaliatory discharge "for refusing to participate in an illegal act and for reporting the illegal act."
¶ 11. Finally, Braidfoot also argues that summary judgment was inappropriate as he was deprived of certain discovery prior to the final judgment. He urges that the circuit court's order was premature as the Appellees had not provided responses to certain discovery requests.

B. William Carey College, William E. Payne, Bobby Williamson, Larry Patterson, William Browning, Ben Carlisle and Bobby Perry
¶ 12. The College, Payne, Williamson, Patterson, Browning, Carlisle and Perry contend that the settlement/release agreement is valid and enforceable because (1) Mississippi law favors enforcement of releases *648 not procured by fraud; (2) Braidfoot accepted the amounts paid to him by the College knowing he was being paid for settlement of possible claims he may have had against the College; (3) the release/settlement was not procured by fraud or misrepresentations; (4) the settlement/release was supported by consideration; and (5) principles of equitable estoppel prohibit Braidfoot from challenging the validity of the agreement because he [Braidfoot] retained all the benefits provided to him pursuant to the agreement.

C. James Edwards
¶ 13. Edwards, formerly the President of William Carey College, also contends that any and all claims Braidfoot may have had against him were extinguished by the settlement/release agreement pursuant to the language contained in the agreement in which Braidfoot agreed to:
completely and finally remise, release, acquit, discharge, and hold harmless, WILLIAM CAREY COLLEGE, its trustees, president, officer, insurers, successors, designees, representatives, agents, servants, and employees ... of and from any and all claims....

D. Barbara Jones
¶ 14. Jones, the consultant employed by the College to complete the Title III Grant application, likewise contends that all of Braidfoot's claims were covered by the release. Alternatively, Jones contends that Braidfoot failed to identify any evidence of genuine issue of material fact that she owed Braidfoot any duty that was breached or that Braidfoot was injured by any action or conduct of her.

E. James Guenther and Guenther, Jordan & Rogers, PC
¶ 15. Guenther and his law firm assert that Braidfoot's use of principles of equitable estoppel as to the agreement is untimely. Guenther points out that Braidfoot did not allege the doctrine of equitable estoppel at the trial court level and that he is therefore prohibited from raising the theory for the first time on appeal. Even further, Guenther contends that the circuit court was correct in determining that summary judgment was appropriate because at all times he represented to Braidfoot that he, individually, and his law firm were representing the interests of his client, the College, and had no fiduciary obligations to Braidfoot.

F. Mississippi Baptist Convention.
¶ 16. The Convention contends that Braidfoot failed to assert any claims or causes of action in his complaint against it. The Convention points out that in his appellate brief Braidfoot claims that the Convention was part of a "conspiracy to misrepresent, defraud and mislead" him into executing the settlement and release. The Convention charges that such claims were not included in Braidfoot's complaint, nor was there any such evidence submitted in the response to the motion to dismiss/summary judgment. The Convention further contends that the allegations are unsupported by any substantive evidence. The Convention argues that such claims should not be considered by this Court and that such claims cannot form the basis for reversal of summary judgment.
¶ 17. Finally, the Convention contends that under Mississippi's Nonprofit Corporation Act, section 79 -11-181 of the Mississippi Code, it is not liable for the acts, debt, liabilities or obligations of the College. Further, the Convention asserts that it is like a shareholder in a for-profit corporation and thus protected from liability for any alleged liable acts of the College. According to the Convention, the only possible claims against it would be *649 based on theories of vicarious liability. Because of the facts of this case and the lack of direct allegations against the Convention and some evidence showing wrongful acts of any representatives of the Convention, it argues that the lower court's decision to grant summary judgment in its favor was proper. Alternatively, the Convention argues that even if Braidfoot asserted valid claims against the Convention, summary judgment was nevertheless appropriate pursuant to the valid settlement and release agreement.

III. ANALYSIS AND DISCUSSION OF THE ISSUES

A. Standard of Review.
¶ 18. When a circuit court has granted a summary judgment, this Court's review is de novo. McGee v. Swarek, 733 So.2d 308 (¶ 10) (Miss.Ct.App.1998). "We afford no deference to the trial court's decision. Rather, we review the entire record on appeal to determine whether, in the view of this Court, a grant of summary judgment is appropriate and only if we independently arrive at that conclusion that summary judgment was warranted will we affirm." Id. (citingStonecipher v. Kornhaus, 623 So.2d 955, 960 (Miss.1993)).
¶ 19. It is well-settled that under Rule 56 of the Mississippi Rules of Civil Procedure, summary judgment is appropriate when there are no disputed issues of material fact and that the moving party is entitled to prevail as a matter of law. M.R.C.P. 56; Yowell v. James Harkins Builder, Inc., 645 So.2d 1340, 1343 (Miss. 1994). However, when deciding whether summary judgment is appropriate, we must view the evidence in a light most favorable to the non-movant. Brent Towing Co., Inc. v. Scott Petroleum Corp., 735 So.2d 355 (¶ 12) (Miss.1999). Furthermore, the non-movant is granted the benefit of all inferences that can be adduced from the evidence. Id.
¶ 20. The central issue before us is whether Braidfoot and the College entered into a binding settlement and release. This appeal involves Braidfoot's accusations that he relied on certain representations made to him in executing the release and settlement between himself and the College.
¶ 21. We pause to recognize current law regarding the propriety of summary judgment in cases involving allegations of fraud. The Mississippi Supreme Court has indicated that disposal of a case by summary judgment may not be appropriate in cases where the allegations are of fraud. See, e.g., Allen v. Mac Tools, Inc., 671 So.2d 636, 643 (Miss.1996); Cunningham v. Lanier, 555 So.2d 685, 687 n. 2 (Miss.1989). However, recently, we stated:
It is true that appellate courts are particularly reluctant to sustain summary judgments in matters involving allegations of fraud. Nevertheless, realizing that fraud must be proved by the high standard of clear and convincing evidence, the Mississippi Supreme Court has affirmed a grant of summary judgment in a fraud case where the court was satisfied that a jury applying that high standard to the known facts could not reasonably find a fraud to have been committed.
McGee v. Swarek, 733 So.2d 308 (¶ 13) (Miss.Ct.App.1999) (citations omitted). Accordingly, to determine that summary judgment was proper in this case, we must also find that a jury could not have reasonably concluded that Braidfoot was coerced into entering into the release and settlement based on fraudulent representations made to him by the College and/or its agents and representatives.

*650 B. Breach of Fiduciary Duty.

¶ 22. In determining whether there are genuine issues of material fact in dispute pertaining to Braidfoot's claims of breach of fiduciary obligations, it was necessary that Braidfoot, in responding to the motion for summary judgment, to come forward with some evidence that a confidential relationship existed between him and the Appellees. His complaint charges that he was in a fiduciary relationship with all of the named Appellees.
¶ 23. "The existence of a fiduciary duty must be established before a breach of that duty can arise." Merchants & Planters Bank of Raymond v. Williamson, 691 So.2d 398, 403 (Miss.1997) (quoting Lowery v. Guaranty Bank and Trust Co., 592 So.2d 79, 83 (Miss.1991)). To establish that he was in a fiduciary or confidential relationship with the Appellees, Braidfoot was required to produce evidence of a relationship where the Appellees were dominant and exhibited overmastering influence over him [Braidfoot] and that he was a dependent person or justifiably reposed trust in the Appellees. See Madden v. Rhodes, 626 So.2d 608, 617 (Miss.1993) (citing Hendricks v. James, 421 So.2d 1031, 1041 (Miss.1982)). Concerning fiduciary relationships, the Mississippi Supreme Court has stated: "Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character." Mullins v. Ratcliff, 515 So.2d 1183, 1191 (Miss.1987) (quoting Hendricks, 421 So.2d at 1041).
¶ 24. Reviewing the record, it appears that Braidfoot failed to point to any evidence that the Convention, Edwards, Jones, Payne, Guenther, Guenther, Jordan & Rogers P.C., Bobby Williamson, Patterson, Browning, Carlisle, and Perry, were in a relationship in which they exerted dominating and overmastering influence over him. The evidence shows that Braidfoot is a well-educated and intelligent individual. Moreover, Braidfoot exhibited in his negotiations with the College and in his written communications with the College and others which were included in the record his ability to aggressively negotiate thereby refuting claims that his assent to the terms of the settlement/release agreement was a result of coercion, weakness of mind or by overmastering influence of any of those named above, including the College.
¶ 25. As to the College, the evidence is that he had an employment contract with the College. Contractual obligations do not automatically rise to the level of fiduciary obligations. The Mississippi Supreme Court has acknowledged:
[E]very contractual agreement does not give rise to a fiduciary relationship, such relationship may exist under the following circumstances: (1) the activities of the parties go beyond their operating on their own behalf, and the activities for the benefit of both; (2) where the parties have a common interest and profit from the activities of the other; (3) where the parties repose trust in one another; and (4) where one party has dominion or control over the other.
Hopewell Enter., Inc. v. Trustmark Nat'l Bank, 680 So.2d 812, 816 (Miss.1996) (quoting Carter Equip. Co. v. John Deere Indus. and Equip. Co., 681 F.2d 386 (5th Cir.1982)).
¶ 26. First, in this case, the College was not obligated to act in a manner benefitting both the College and Braidfoot. Although the College and Braidfoot had a common interest, in educating the College's *651 students, and each reposed some mutual trust, the critical element that the College exercised dominion or overmastering control over him is lacking. The relationship between the College and Braidfoot was contractual, the terms of the relationship were delineated by the employment contract. We are unconvinced that the College occupied a position of such trust with Braidfoot that it owed fiduciary obligations to him. Even further, we do not believe that a reasonable jury, on the facts presented, could find that a fiduciary relationship existed between Braidfoot and any of the Appellees.
¶ 27. Accordingly, we, find that Braidfoot failed to meet the requirements of producing sufficient evidence showing that genuine material facts existed giving rise for a jury determination of the existence of a fiduciary relationship between Braidfoot and the Appellees. Because of the lack of any evidence of a fiduciary relationship between Braidfoot and any of the Appellees, collectively or individually, there could be no breach of fiduciary duties. Summary judgment was proper as to this issue.

C. Breach of Duty of Fair Dealing.
¶ 28. Braidfoot asserts that all the Appellees, collectively and individually, owed to him a duty of fair dealing which each Appellee breached. The tort of breach of a duty of fair dealing, which emanates from the law on contracts, provides that "[a]ll contracts contain an implied covenant of good faith and fair dealing in performance and enforcement." Morris v. Macione, 546 So.2d 969, 971 (Miss.1989). "The covenant of good faith and fair dealing in contract has force in the statutory law as well. `Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement.'" Cenac v. Murry, 609 So.2d 1257, 1272 (Miss.1992) (quoting Miss.Code Ann. § 75-1-203 (1972)). The Mississippi Supreme Court, relying on the RESTATEMENT (SECOND) OR CONTRACTS, has stated:
Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness.
Cenac, 609 So.2d at 1272 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205, 100 (1979)).
¶ 29. There are two contracts at issue in this case: Braidfoot's employment contract and the settlement/release agreement. For the 1994-95 school year, Braidfoot was under contract with the College in his position as provost. While the Board of Trustees negotiated his leave of absence in the May 24, 1995 settlement and release, it is undisputed that Braidfoot was paid his full salary for the remainder of the 1994-95 school year which ended in August of 1995. Nothing in the record supports a claim that this contract was breached or that the College breached its implied duty of good faith and fair dealing as to the 1994-95 employment contract.
¶ 30. As to the 1995-96 school year, Braidfoot received his full salary for the 1995-96 school year pursuant to the terms of the May 24, 1995 settlement and release. In exchange for Braidfoot's leave of absence for that school year, Braidfoot received his salary in addition to an off-campus office, a lap-top computer, travel expenses and other benefits.
¶ 31. Here is the point at which Braidfoot argues that the Appellees, again collectively and individually, breached duties of good faith and fair dealing. Good faith is defined as "the faithfulness of an *652 agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party." Cenac, 609 So.2d at 1272. Consequently, the breach of good faith is defined as "some conduct which violates standards of decency, fairness or reasonableness." Id. (citing RESTATEMENT (SECOND) OF CONTRACTS § 205, 100 (1979)). The agreed purpose of the settlement and release in this case was Braidfoot's acquiescence to his leave of absence and release of claims in exchange for a settlement of money and other things. The College fulfilled all of the terms of this contract, and there is no evidence of breach.
¶ 32. The record also is devoid of any evidence of any actions by the College which might constitute bad faith in negotiating or executing the terms of the settlement and release or Braidfoot's 1994-95 employment contract. It is undisputed that Braidfoot received all promised money and other things as bargained for in the contract. Accordingly, we conclude that Braidfoot has failed to meet his burden in coming forward with sufficient evidence to show that genuine issues of material fact are in dispute as to his claim that the Appellees breached a duty of good faith and fair dealing.

D. Misrepresentation and Fraud in the Inducement.
¶ 33. Braidfoot goes to great lengths to convince this Court of the illegal actions of the College's administration and the other named Appellees. However, whether or not the College in fact attempted a "cover-up" or made knowingly false statements on its federal grant application is not all together relevant to Braidfoot's assent to the terms of the settlement and release he executed. Braidfoot's principle assertion is that members of the College's Board of Trustees intentionally deceived him about the investigation they conducted into the College's actions involving the grant application. Braidfoot claims that he relied on their conclusion that the misstatements in the grant application were "immaterial." This reliance, Braidfoot contends, is what induced him to sign the release and settlement.
¶ 34. To succeed in a claim of fraud, a party must show: (a) a material and false representation, (b) which is known by the speaker to be false, (c) and which is intentionally made to induce the hearer to act in reliance thereon, and (d) the hearer does act to his detriment in reasonable reliance on the false representation, and (e) the hearer consequently suffers an injury based on such reliance. McGee, 733 So.2d at 312. In defense of the motion for summary judgment, Braidfoot was required to come forward with sufficient evidence to establish genuine issues of material fact in dispute as to each of these elements. In other words, to withstand a summary ruling, Braidfoot, through the use of affidavits and other supporting documents and evidence, was thereby compelled to produce evidence establishing that a reasonable jury could have found (1) that the reports he received from the College and the Board of Trustees that the misstatements on the grant application were insignificant was a material and false representation, (2) that such was known to the Appellees to be a false representation, (3) that he relied on such information in executing the release and settlement, and (4) that agreeing to the terms of the settlement and release was an act detrimental to his interests such that he suffered an injury directly based on his reliance of the material and false representation.
¶ 35. In response to the motion for summary judgment, Braidfoot relied on his complaint, his affidavit, certain correspondence *653 and memoranda, the Board's resolution to offer Braidfoot a settlement, the U.S. Department of Justice's press release, and two press releases from the College. Of this evidence, to support the elements of fraud, there is Braidfoot's affidavit in which he claims that he was induced to sign the release and settlement based on the reports to him that the Board conducted its investigation and found no wrongdoing by members of the College's administration. Giving him the benefit of the doubt, this supports the third element of fraud that he relied on the representation of the Appellees in making his decision to sign the settlement and release.
¶ 36. Regarding the first element of fraud, however, there is no evidence that the representations made to Braidfoot were actually material and false. Even assuming such representations were false, there is no evidence, other than Braidfoot's claims, showing that they were material to Braidfoot's signing the release and settlement. Braidfoot asserts that he was "assured" that an "independent" investigation revealed that any misstatements in the grant application were insignificant.
¶ 37. Prior to the Board's investigating his allegations of fraud and misconduct, Braidfoot had compiled a list of twenty-five instances in which he claimed misstatements were made on the grant application. As previously stated, the majority of these instances were references to the existence of College committees and a list of those participating on the various committees. The record shows that Braidfoot went as far as to even talk to a couple of other individuals whose names where included as members of the various committees who confirmed for him that such committees were not formed and functioning as described on the grant application. Given the information Braidfoot gathered about the statements on the application, we are not persuaded that a reasonable jury could determine that at the time Braidfoot signed the settlement and release, he believed that he was "mistaken" about his ideas that the College had made misrepresentations on the grant application.
¶ 38. What seems to be the case, however, is that after the U.S. Department of Justice's investigation resulted in a settlement with the College and after the Justice Department made a public statement that Edwards made false reports regarding the College's method of annually assessing its programs and services, Braidfoot sought to obtain redemption by seeking to invalidate his release and settlement contract. The College and the Board continued to maintain that its investigation using a national consultant and other experts revealed that any errors made in the grant application were unintentional and immaterial and that the settlement with the federal government was not an admission of wrong doing. Even assuming that the College and Board violated federal laws, there is still no evidence that the College's or the Board's motivation in conducting its investigation was to induce Braidfoot to enter into the settlement and release.
¶ 39. Even if we were to assume that the representations were material and false, and that they were made intentionally to induce Braidfoot into signing the agreement, Braidfoot has completely failed in his burden in producing some evidence of his injury-the final element of fraud/fraud in the inducement. Braidfoot was an employee hired by annual contracts. The Board of Trustees had the option of renewing the contract yearly. Absent good cause, Braidfoot could be only terminated by non-renewal of his contract. Having not been tenured, Braidfoot enjoyed no security that he would be re-employed the following year.
*654 ¶ 40. The only statements as to his injury are found in his complaint where Braidfoot contends that he suffered a loss of income and employee benefits. In addition, he complains that he suffered mental distress and emotional anguish a result of his "retaliatory discharge." The record is devoid of what loss of income Braidfoot has had or what employee benefits he lost. According to the settlement and release, Braidfoot was to receive a full salary, medical and life insurance, tuition discounts for his son and the like. There is no dispute whatsoever that Braidfoot received everything to which he was entitled under the settlement contract. Further, it is undisputed that Braidfoot has not returned any of the money he received under the contract to dispute the validity of the settlement.
¶ 41. Undisputed is the fact that Braidfoot was paid his full salary for the school years of 1994-95 and 1995-96. Consequently, the evidence supports a finding that Braidfoot's employment contract was not breached, but rather it was fully performed. Further, Braidfoot claims that he was terminated for refusing to participate in illegal activities. Again, we are not convinced. Rather, it is undisputed that Braidfoot, having attained a juris doctorate degree, intelligently and knowingly negotiated his leave of absence and the end of his employment with the school with significant benefits-a full-time employee salary, an office paid for by the College, and, among other things, a letter of recommendation.
¶ 42. Taken in the light most favorable to Braidfoot as the non-moving party, the College and the Board's representations to Braidfoot regarding the investigation may not have been factually accurate. "However, not every spoken untruth is actionable as a fraud. It is only if that untruth was designed to, and did, in fact, induce the hearer to change his position in justifiable reliance on the untruth that it becomes potentially actionable." McGee, 733 So.2d at (¶ 16). We are unpersuaded that a reasonable jury could decide that Braidfoot changed his position in reliance that the College and Board determined that his assertions of dishonesty were untrue. As stated, there is no evidence suggesting that the conclusion of the Board of the College's misstatements on the grant application were specifically drawn to induce Braidfoot to enter into the settlement agreement. Even if the Board had determined that false reports by the College's administration were made, it is undisputed that Braidfoot's relationship with the administration had deteriorated to a point that the Board would have not renewed his annual contract at its next opportunity. Moreover, the fact that the U.S. Department of Justice later determined such representations to be significant does not lead directly to a conclusion that the College and Board intentionally set out to provide Braidfoot with information that would induce him to sign the settlement agreement.
¶ 43. Accordingly, we conclude that Braidfoot failed to set forth genuine material facts in dispute such that a jury could reasonably determine that he was fraudulently induced into executing the settlement and release. Because Braidfoot asserts claims that are barred by the terms of the release, Braidfoot's claims must fail. We find that summary judgment was appropriate on this issue.

D. Tortious Breach of Contract
¶ 44. Braidfoot maintains that the Appellees, collectively and severally, refused to abide by the terms of Braidfoot's employment contract. Additionally, Braidfoot contends that he suffered a illegal retaliatory discharge because he refused to *655 participate in the College's fraud involving the grant application.
¶ 45. "Tortious breach of contract requires, in addition to a breach of contract, some intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort." Southern Natural Gas Co. v. Fritz, 523 So.2d 12, 19-20 (Miss.1987). Recently the Mississippi Supreme Court has determined that retaliatory discharge is another form of tortious breach of contract claim. Willard v. Paracelsus Health Care Corp., 681 So.2d 539, 543 (Miss.1996). Thus, where a fact finder has decided that a plaintiff was wrongfully discharged under Mississippi's common law regarding retaliatory discharge, such action by an employer is an "independent tort giving rise to punitive damages." Id. at 542.
¶ 46. The problem here is that the evidence in this case fails to supports a tortious breach of contract/retaliatory discharge claim. As we have previously concluded, there has been no breach of contract; consequently, there could be no tortious breach of contract. The retaliatory discharge claim is directly undermined by the fact that Braidfoot knowingly and intelligently negotiated the terms of his leave of absence and termination. Accordingly, we rule that summary judgment here was proper.

E. Equitable Estoppel
¶ 47. Braidfoot's argument that principles of equitable estoppel apply thereby making the settlement and release agreement voidable is procedurally barred. "[I]t is a rule of almost universal application that questions of whatever nature not raised in the trial court and preserved for review will not be noticed on appeal." Hans v. Hans, 482 So.2d 1117, 1122 (Miss. 1986). Braidfoot's argument was not presented to the court below and is not found in his complaint. Accordingly, this issue is wholly without merit.

F. Discovery
¶ 48. Braidfoot raises for the first time on appeal that summary judgment was premature because the Appellees had not yet responded to his timely made discovery requests. The record shows that after the Appellees filed their motion to dismiss or alternatively for summary judgment, the Convention and Guenther and his law firm, separately, filed motions to stay discovery. Subsequently, Braidfoot responded to the motion to dismiss/summary judgment and in support thereof attached: the complaint; his affidavit; several pieces of correspondence between himself and Perry, Edwards, Williamson and one memo addressed to Edwards from Guenther; the Board's resolution to offer Braidfoot a settlement; the U.S. Department of Justice press release, and two press releases of the College. The day after he filed his response to the motion to dismiss/summary judgment, Braidfoot filed his motion in response to the motions to stay discovery. While Braidfoot acknowledged that he had already responded to the dispositive motions filed by the Appellees, he claims he was still in need of the discovery he requested and asked the court to deny the motions to stay discovery.
¶ 49. The trial court was never called on to rule on the motions to stay discovery. While the trial judge's opinion and order on the motion for summary judgment reflects that a hearing was had, we were not provided a transcript of such hearing. Nor is there anything in the record indicating that the trial court was asked to delay ruling on the motion for summary judgment until discovery could be completed. Braidfoot apparently failed to move the lower court for a continuance so that *656 certain discovery may be completed. Because a party may not raise for the first time an issue on appeal, we rule that this issue is barred. Id. Additionally, we rule that this is without merit.
¶ 50. THE JUDGMENT OF THE CIRCUIT COURT OF FORREST COUNTY OF SUMMARY JUDGMENT IN FAVOR OF THE APPELLEES IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, AND PAYNE, JJ., CONCUR. LEE, THOMAS, AND MYERS, JJ., NOT PARTICIPATING.