GRIFFIS, J.,
for the Court.
¶ 1. S.K. Desai, d/b/a H.Y.S.H. Corporation (“Desai”), requested reimbursement from the Mississippi Commission on Environmental Quality (the “Commission”) for costs incurred in replacing underground storage tanks, pursuant to the Mississippi Groundwater Protection Trust Fund. After an evidentiary hearing, the Commission determined that Desai did not qualify to receive reimbursement. Desai appealed the Commission’s decision to the Chancery Court of Madison County. The chancellor reversed the Commission and ordered reimbursement. Finding that the Commission’s order was supported by substantial evidence, we reverse and reinstate the Commission’s order.
FACTS
¶ 2. On April 14, 1993, Desai purchased the property known as Hawkeye’s Exxon, which is located in Canton, Mississippi. On May 7, 1993, Desai filed the required notification of underground storage tanks form with the Mississippi Department of Environmental Quality (“MDEQ”) covering five underground storage tanks at Hawkeye’s Exxon.
¶ 3. On January 7, 1994, MDEQ sent Hawkeye’s Exxon a leak detection survey that informed Desai of the acceptable methods of leak detection and requested that Desai advise MDEQ of the type of leak detection utilized at the site. Desai did not respond to the request.
¶ 4. On March, 15, 1994, MDEQ sent Hawkeye’s Exxon a second letter asking for disclosure of the method of leak detection. With this letter, MDEQ again advised Desai of the acceptable methods of tank and line leak detection. Desai did not respond to the second request.
¶ 5. On April 18, 1994, MDEQ sent Hawkeye’s Exxon a third letter, by certified mail, asking for disclosure of the method of leak detection. MDEQ again included a description of the acceptable methods of tank and line leak detection. Desai responded on June 8, 1994, and identified the method of leak detection used at Hawkeye’s Exxon.
¶ 6. On May 19, 1997, Gloria Ellington, an employee at Hawkeye’s Exxon, discovered a petroleum product seeping through the cracks in concrete near the underground storage tanks. Ellington notified MDEQ that a possible petroleum release had occurred. MDEQ inspected the site and confirmed the release. MDEQ also discovered that a monitoring well cover *383 near the seeping petroleum product was obstructed by concrete and debris.
¶ 7. On May 23, 1997, MDEQ requested the last six months of required leak detection records from Desai. By letter dated June 3,1997, Desai advised MDEQ that he could not produce copies of any leak detection records. Desai, however, requested reimbursement from the Mississippi Groundwater Protection Trust Fund (the “Trust Fund”) for the costs of the investigative and remediation activities related to the petroleum release. MDEQ determined that Desai was not eligible for reimbursement from the Trust Fund because he had failed to comply with the underground storage tank regulations. MDEQ advised Desai that he had failed to conduct and record leak detection and failed to have a valid method of leak detection for pressurized piping. Desai requested a hearing on the determination of Trust Fund eligibility.
¶ 8. In December of 1997, the Hawkeye’s Exxon site was remediated by excavating and hauling off the contaminated soil. In January of 1998, MDEQ confirmed that Desai had sufficiently remediated the site.
¶ 9. An evidentiary hearing was held before the Commission on Desai’s eligibility for reimbursement from the Trust Fund. Thereafter, the Commission entered an order concluding that Desai was not in substantial compliance with underground storage tank regulations and, therefore, was ineligible for reimbursement from the Trust Fund for the assessment and cleanup costs incurred at the Hawkeye’s Exxon site.
¶ 10. Desai appealed the Commission’s order. Having briefed the issues for the chancery court, on November 17, 1999, Desai and the Commission presented oral arguments. At the conclusion of oral argument, the chancellor indicated that she would take the arguments under advisement, review the Commission’s records, and make a decision.
¶ 11. The chancellor took no action for over a year. On March, 20, 2001, Desai’s counsel submitted an unsolicited proposed opinion and judgment to the chancellor. On April 16, 2001, before the Commission could respond and submit its own proposed opinion and judgment, the chancellor entered an order that reversed and remanded the Commission’s order. The chancellor adopted and entered the proposed opinion submitted by Desai.[1]
STANDARD OF REVIEW
¶ 12. The standard of review for our consideration of the findings and conclusions of an administrative agency is well established. The appellate or reviewing court will entertain the appeal only to determine whether or not the order of the administrative agency (1) was unsupported by substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party. These are the only grounds for overturning an agency action; otherwise, the agency’s determination must remain undisturbed. Miss. Comm’n on Envt’l Qlty. v. Chickasaw *384 County Bd. of Supervisors, 621 So.2d 1211, 1215 (Miss.1993).
¶ 13. Also, there is a rebuttable presumption in favor of an administrative agency’s actions. United Cement Company v. Safe Air for the Environment, 558 So.2d 840, 842 (Miss.1990). So long as substantial evidence exists, an agency’s fact finding must be allowed to stand “even though there might be room for disagreement on that issue.” Mississippi Public Service Comm’n v. Merchants Truck Line, Inc., 598 So.2d 778, 782 (Miss.1992). Neither the chancellor nor this Court is authorized to substitute its judgment for that of the Commission where there was substantial evidence to support the Commission’s finding. Id. Where a circuit or chancery court exceeds its authority and overturns an agency action, this Court will reverse and reinstate the agency’s order. Id.
ANALYSIS

I. Introduction to Mississippi Underground Storage Tank Act.

¶ 14. The Mississippi Underground Storage Tank Act of 1988 is codified at Mississippi Code Annotated Sections 49-17-401 through 49-17-435 (Rev.2003) (the “Act”). The Act created the Trust Fund, which is a form of financial assurance for owners of underground storage tanks. Miss.Code Ann. § 49-17-405(1) (Rev.2003). Our consideration is focused on the interpretation of Mississippi Code Annotated Section 49-17-405(2), which provides:
The owner of the underground storage tank shall not be liable to the department for such costs if the owner was in substantial compliance on the date on which the discharge of motor fuels which necessitates the cleanup was reported to [MDEQ], Otherwise owners are responsible for reimbursement and the reimbursed monies shall go back into the [Trust Fund].
¶ 15. Thus, the Act authorizes the Commission to determine whether owners of underground storage tanks are in “substantial compliance” with the regulations and whether cleanup costs may be reimbursed by the Trust Fund. “Substantial compliance,” as defined by statute, requires that an owner or operator of an underground storage tank has registered the tank with MDEQ and has made a good-faith effort to comply with the Act and the rules and regulations of the Commission. Miss.Code Ann. § 49-17-403(q) (Rev.2003). Accordingly, the ultimate question is whether there was substantial evidence to support the Commission’s finding that Desai was not in substantial compliance with the Act and the applicable regulations.
¶ 16. The Act places several core requirements on owners, which include: the registration of the underground storage tanks by the owner; the timely payment of the underground storage tank regulatory fee; and the compliance with equipment maintenance, anti-corrosion, release, and leak detection requirements. Miss.Code Ann. § 49-17-413 (Rev.2003); Miss.Code Ann. § 49-17-409 and 49-17-421(Rev.2003); 40 C.F.R. Sections 280.34, 280.40-45.
¶ 17. Pursuant to its authority, the Commission also adopted regulations governing underground storage tanks. The regulations adopted by the Commission were identical to the Environmental Protection Agency regulations. See 40 C.F.R. Section 280. The Commission’s underground storage tank regulations specifically require owners to maintain records related to compliance with leak detection requirements (40 C.F.R. Sections 280.34 and 280.45) and to maintain and monitor leak detection for tanks and piping of the *385 underground storage tank system. (40 C.F.R. Sections 280.40-45). Leak detection for tanks requires monitoring every thirty days. (40 C.F.R. Section 280.41). Leak detection for piping requires monthly monitoring or an annual line tightness test. Id. Considering the statutes and regulations, we examine the factual and legal support underlying the Commission’s decision.

II. Whether the Commission’s order was unsupported by substantial evidence?

¶ 18. The Commission determined that Desai was not in substantial compliance with the Act and relevant regulations. The Commission’s order concluded:
[A]t the hearing on October 22,1998, the substantial evidence proved that at the time the release was reported on May 19, 1997, [Desai] had not performed the required monthly monitoring and had no written documentation of monthly monitoring for the leak detection for his [underground storage tanks] in violation of Sections 40 CFR 280.34 and 280.40-45 of the Mississippi Underground Storage Tank Regulations. The substantial evidence also revealed that [Desai] did not have records indicating that he tested the automatic line leak detector annually and [Desai] did not have a monthly monitoring method for leak detection or conduct an annual line tightness test for his pressurized piping in violation of Section 40 CFR 280.34 and 280.40-45 of the Mississippi Underground Storage Tank Regulations. The Commission determined that [Desai] was not in substantial compliance on the date on which the discharge of the motor fuels which necessitated the cleanup was reported to the department and ineligible for reimbursement from the Trust Fund.
¶ 19. The record before the Commission indicated that Desai admitted, at the hearing, that he never monitored the leak detection for the tanks and piping until after the release was reported to MDEQ, on May 19, 1997. Pursuant to Section 280.40(c) of the Underground Storage Regulations, Desai was required to comply with the leak detection requirements by December 22, 1993. Thus, Desai operated Hawkeye’s Exxon for four years, prior to the release, without maintaining the required leak detection monitoring, in direct violation of the regulations. The Commission considered the duration of noneompli-anee, with the underground storage tank leak detection requirements, was significant and did not exhibit a good faith effort to comply with the regulations.
¶ 20. In addition, the Commission found evidence that the monitoring well cap near the seeping fuel was covered in part by concrete and debris, which prevented the required monitoring. The Commission considered this to be evidence that, prior to the release, Desai completely ignored the leak detection monitoring requirements. The Commission found that the monitoring wells and automatic line leak detector served no purpose in detecting releases and minimizing contamination since Desai never monitored the system.
¶ 21. Desai challenges the Commission’s findings. Desai argues that, while not in strict compliance, he was in substantial compliance with the Act and applicable regulations. As evidence of his compliance, Desai points to the fact that he paid the underground storage tank regulatory fee and that he had the necessary equipment in place.
¶ 22. Desai also argues that the Commission erred .in its determination of substantial compliance, based on whether De-sai “made a good faith effort to comply with the law; and the rules and regula *386 tions adopted pursuant thereto.” Miss. Code Ann. § 49-17-403(k). Desai claims that the Commission made no finding on whether Desai made a good faith effort and had no statutory or regulatory definition of the meaning of the term “good faith.”
¶ 23. To establish his “good faith” effort to comply, Desai made three factual arguments: (a) Desai claimed that he only received one of three letters that MDEQ mailed to him notifying him of the leak detection requirements and requesting verification that he was in compliance; (b) Desai claimed that he “could have been confused” or “could have misunderstood” the requirements because his native tongue was an Indian language called Gujarat; and (c) Desai claimed that he lacked a native born American’s ability with English. Desai also argues that the Commission failed to follow the definition of “good faith” contained in the Uniform Commercial Code, which defines good faith as honesty in fact. Miss.Code Ann. § 75-1-203(19). Desai asserts that he was in good faith compliance because he was honest in his dealings with MDEQ and that he met almost all of the requirements.
¶24. To counter Desai’s claims, the Commission found that Desai understood the English language well enough to serve as an alderman for the City of Canton, that Desai could have contacted or visited MDEQ’s headquarters to answer any questions, or that Desai could have attended one of the publicized seminars on Underground Tank Storage Act compliance to gain a better understanding of the requirements.
¶ 25. The Commission contends that it was not required to adopt a definition of the term “good faith,” pursuant to the Mississippi Administrative Procedures Act. The Commission argues that it has the statutory authority to determine if there was a good faith effort to comply with the law, sufficient to satisfy the “substantial compliance” requirement of the Act. The Commission argues that it found that its decision was based on the fact that Desai made virtually no effort to comply. While Desai did pay the required fees and installed equipment, he did not comply with what the Commission considered to be the most important aspects of the Act, leak detection monitoring and record keeping requirements.
¶ 26. The term “good faith” is commonly used. Like many terms of general reference, some statutes may specifically define the term and other statutes may not. Mississippi Code Annotated Section 1-3-65 provides that “[a]ll words and phrases contained in the statutes are used according to their common and ordinary acceptation and meaning; but technical words and phrases according to their technical meaning.”
¶ 27. Desai urges us to apply the definition of “good faith,” established in Mississippi’s Uniform Commercial Code, where good faith is defined as “honesty in fact in the conduct or transaction concerned.” Miss.Code Ann. § 75-1-201(19) (Rev.2002). The Commission’s consideration of Desai’s request for reimbursement is not controlled by the UCC. Instead, the Uniform Commercial Code regulates the conduct of parties under certain circumstances, such as the sale goods. The UCC definition of good faith has been criticized as the rule of “the pure heart and empty head.” Black v. Peoples Bank and Trust Co., 437 So.2d 26, 29 (Miss.1983).
¶ 28. The term “good faith” has different definitions in other areas of our jurisprudence. For example, the supreme court considered the term “good faith” in relation to the performance of contracts, e.g., a claim for breach of the duty of good faith and fair dealing. The court held:
*387 A leading contracts treatise describes the duty of good faith and fair dealing as follows:
In recent years, courts have often supplied a term requiring both parties to a contract to exercise what is called ‘good faith’ or sometimes ‘good faith and fair dealing.’ This duty is based on fundamental notions of fairness, and its scope necessarily varies according to the nature of the agreement. Some conduct, such as subterfuge and evasion, clearly violates the duty. However, the duty may not only proscribe undesirable conduct, but may require affirmative action as well. A party may thus be under a duty not only to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of the other party’s duty, but also to take some affirmative steps to cooperate in achieving these goals. Farnsworth, Contracts, §§ 7.17, 526-27 (1982).
Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness. Restatement (Second) of Contracts §§ 205,100 (1979).
Cenac v. Murry, 609 So.2d 1257, 1272 (Miss.1992).
¶ 29. In Bailey v. Bailey, 724 So.2d 335, 338 (Miss.1998), the court considered the definition of bad faith as “[t]he opposite of ‘good faith,’ generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one’s rights or duties, but by some interested or sinister motive.” The term “good faith” has even been said to be “a term which is not susceptible of precise definition and is generally determined on a case-by-case basis.” Joe Lee, Bankruptcy Service, Lawyers Edition Consultant § 34:398 (Rev.2003) (citing In re Lake States Commodities, Inc., 253 B.R. 866 (Bankr.N.D.Ill.2000)).
¶ 30. We reject Desai’s contention that the Commission was in error because it had failed to define “good faith,” pursuant to the Mississippi Administrative Procedures Act. Under any of the definitions cited above, there was substantial evidence to support the Commission’s finding that Desai failed to make a “good faith” effort to comply with the Act and its regulations, i.e., substantial compliance. Under the definition in Cenac, Desai’s conduct could be considered as “evasion” of his obligations under the Act or the failure to “take some affirmative steps to cooperate in achieving” the goals or purpose of the Act.
¶ 31. Indeed, the Legislature granted the Commission the authority, pursuant to the Act, to make such determination on a case-by-case basis. We do not reweigh the evidence; instead, we simply determine whether there was substantial evidence to support the decision. We cannot say that the Commission’s findings were in derogation of its duties under the Act.
¶ 32. Leak detection was clearly a core requirement of the Act. If an underground storage tank owner, such as Desai, is allowed to gain Trust Fund eligibility, without having performed the required leak detection monitoring or record keeping, then his and similar claims could threaten MDEQ’s ability to enforce leak detection compliance, would endanger human health and the environment, and would jeopardize the solvency of the Trust Fund. By affirming the chancellor here, we would penalize *388 the underground storage tank owners who expend the necessary time, effort, and resources to comply with the imposed leak detection requirements.
¶ 33. We are of the opinion that the Commission’s finding that Desai failed to substantially comply with the Act, and related regulations, was in fact supported by substantial evidence.

III. Whether the Commission’s order was arbitrary or capricious?

¶ 34. The Mississippi Supreme Court adopted the following definitions of arbitrary and capricious:
The terms “arbitrary” and “capricious” are open-textured and not susceptible of precise definition or mechanical application. We find helpful meanings North Carolina has assigned in a not-dissimilar context:
“Arbitrary” means fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment, but depending upon the will alone, — absolute in power, tyrannical, despotic, non-rational, — implying either a lack of understanding of or a disregard for the fundamental nature of things.
“Capricious” means freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles....
McGowan v. Mississippi State Oil & Gas Bd., 604 So.2d 312, 322 (Miss.1992); Mississippi State Dept. of Health v. Southwest Mississippi Regional Medical Center, 580 So.2d 1238, 1240 (Miss.1991).
¶ 35. As discussed above, the Commission was authorized to determine whether owners of underground storage tanks were in “substantial compliance” with the regulations and whether the reimbursement was to be covered by the Trust Fund. Concluding that there was substantial evidence to support the Commission’s conclusion, we also find that the Commission’s order was neither arbitrary nor capricious.

TV. Whether the Commission’s order was beyond the power of the administrative agency to make?

¶36. Desai does not dispute that the Commission’s order was within its power and authority under the Act and applicable regulations. The Commission was vested with the authority to administer the Act and the Trust Fund.

IV. Whether the Commission’s order violated Desai’s statutory or constitutional rights?

¶ 37. The chancellor’s opinion and judgment ruled that the denial of Trust Fund eligibility to Desai denied him his rights to due process of the law and equal protection of the law, secured by the United States Constitution, including the Fifth and Fourteenth Amendments, and Section 14 of the Mississippi Constitution. The chancellor apparently determined that the Commission applied unwritten policies related to the failure to define the term “good faith,” in violation of the Mississippi Administrative Procedures Law.
¶ 38. As we discussed above, Desai again argues that the failure to reduce to writing its policies concerning its application of the “good faith” requirement of the Act and to promulgate them as regulations as required by the Administrative Procedures Law prohibits the Commission from deciding whether Desai was in substantial compliance. “Good faith” is a term of equity that is not defined in the Act or regulations. Nevertheless, consistent with *389 the definition of substantial compliance found at Mississippi Code Annotated Section 49-17-403(q) (Rev.1999), the Commission determined that Desai did not make a good faith effort to comply with the Act and the underground storage tank regulations.
¶ 39. The Commission’s decision was reasonable and did not violate Desai’s statutory or constitutional rights. As detailed above, Desai’s actions, or lack thereof, supports the Commission’s finding. After De-sai purchased the station in 1993 until the release was reported in 1997, Desai admittedly never conducted leak detection monitoring or maintained record keeping, which are violations of Sections 280.34 and 280.40-45 of the Underground Storage Tank Regulations.
¶ 40. The Commission properly examined Desai’s case on its individual merits to determine whether the owner made a good faith effort to comply with the Act and the regulations. The Commission’s order did not violate Desai’s substantive due process rights, as the decision has a reasonable relation to a proper governmental purpose, which is compliance with leak detection monitoring and recording requirements for underground storage tank systems, and is not an arbitrary exercise of governmental power. Consistent with his procedural due process rights, Desai was allowed a full opportunity to present his case and supporting evidence to the Commission at the hearing held on October 22, 1998, but he did not convince the Commission that he made a good faith effort to comply with the act and the regulations pursuant to Mississippi Code Annotated Section 49 — 17—403(q).
¶41. We find that the Commission’s decision was supported by substantial evidence, was neither arbitrary nor capricious, was within its statutory mandate, and provided Desai with appropriate due process. Accordingly, the chancellor was in error by reversing the Commission’s order. The chancellor’s opinion and judgment is reversed. The order of the Mississippi Commission on Environmental Quality is hereby reinstated.
¶ 42. THE ORDER OF THE CHANCERY COURT OF MADISON COUNTY IS REVERSED. THE ORDER ENTERED BY THE MISSISSIPPI COMMISSION ON ENVIRONMENTAL QUALITY IS REINSTATED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS AND CHANDLER, JJ., CONCUR.

. MDEQ also assigned error because the chancellor inappropriately executed and adopted the unsolicited proposed opinion submitted by Desai's counsel. MDEQ argues that the chancellor's opinion and judgment was executed so quickly after submission that MDEQ was not allowed an adequate opportunity to respond or submit its own proposed opinion. Because we reverse and render on other grounds and because the amendment to Rule 15 of the Mississippi Rules of Appellate Procedure provides an adequate procedure for any future similar unilateral action by an attorney, we decline to consider this assignment of error.