# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00605-COA

**LIBERTY NATIONAL LIFE INSURANCE COMPANY**                    **APPELLANT**

**v.**

**KINSLEE HANCOCK**                                           **APPELLEE**

DATE OF JUDGMENT:              04/30/2021
TRIAL JUDGE:                   HON. JOHN R. WHITE
COURT FROM WHICH APPEALED:     PONTOTOC COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        WAYNE WILLIAMS
ATTORNEYS FOR APPELLEE:        WILLIAM O. RUTLEDGE III
                               JOSEPH RUTLEDGE McMILLIN
                               KAYLYN HAVRILLA McCLINTON
NATURE OF THE CASE:            CIVIL - CONTRACT
DISPOSITION:                   AFFIRMED AND REMANDED - 01/17/2023
MOTION FOR REHEARING FILED:

**EN BANC.**

**McCARTY, J., FOR THE COURT:**

¶1.    A young woman was coerced into signing a life insurance policy by two insurance agents. She was told it would cost her nothing, which proved to be untrue. Not long after, she canceled the policy.

¶2.    Unbeknownst to her, the woman's signature was later forged in order to reinstate the contract. The premium from this fraudulent contract caused her bank account to become overdrawn.

¶3.    She filed a lawsuit against the insurance company, which in turn argued arbitration was required by the terms of the contracts. The trial court determined that "there was no

valid arbitration agreement arising out of the . . . reinstatement," so the woman could not be compelled to arbitrate because "she did not agree to have those disputes arbitrated."

**FACTS**

¶4.     In 2018, Liberty National agents Derrick Walker and Alex Rogers approached a young woman and offered her a deal.  She could get a life insurance policy for nothing; while the premiums would come out of her account, the agents would quickly reimburse her in cash.

¶5.     But Kinslee Hancock would soon find out nothing in life is free.  Just 22 years old at the time, she filled out the paperwork and secured a $41,000 plan for $40.58 a month.

¶6.     The agents who goaded Kinslee into signing the policy explained they wanted her to sign up so they could benefit financially, and this could be accomplished by adding more premiums and contracts to their account.  One of the agents said the policy would only be for a four-month duration, and she could cancel the policy after that time period ended.  Since they told her they would reimburse her, the cost would be "free."

¶7.     So Kinslee signed the life-insurance-policy documents and agreed to allow her bank account to be drafted by Liberty National.  But not long after, according to her complaint, the two Liberty National agents did not pay her back.  As a result, she told one of the agents she wanted to cancel the policy.

¶8.     Kinslee then got a Facebook message from one of the agents.  The message read:

Kins! I need to put your life insurance back on for just one more month so it doesn't mess my pay up for the next four months! Is there any way I can just give you the cash and let them take it out one more time? Pleasssseeeeee

¶9. Kinslee did not reply.

¶10. The agent did not take her silence as a "no." Without her permission, the agent forged the reinstatement form with Kinslee's signature. The company renewed the policy and began to charge her again for the premiums.

¶11. Kinslee found out these payments were being withdrawn from her account only when she received an overdraft fee as a result of the premium payment being withdrawn. Concerned and confused, Kinslee immediately sent the agent a message:



Derrick >

Fri, Mar 15, 4:28 PM

Why did liberty take money from me after I canceled it.

I'm about to come up there. I'm overdrafted $100

Who is this?

Kinslee

I'm trying to be nice about it, but I gave no one permission to use my info or to reinstate my policy after I canceled. I suggest you start talking to mark stone about this before there's a lawsuit because my dad will come down hard on this. That's what you call fraud. I'm not being mean towards you, but that's not fair for me to cancel and it not happen then you ask me if I'd please extend my policy so it won't mess up your pay, but I never agreed with it. What is marks number

¶12. Despite Kinslee's plea for the withdrawals to stop, a month later, Liberty National again drafted the premium amount out of her bank account. Kinslee contacted the director of the Liberty National office, David Knight. He reimbursed her through the Venmo app, explaining via text that he "clean[s] up the few messes we make[.]"

¶13. Afterward, Kinslee went to court to seek redress against the company and its agents, alleging fraud, misrepresentation, breach of duty of good faith and fair dealing, unjust enrichment, forgery, and other torts.

¶14. To his credit, Agent Derrick Walker admitted he had done just what Kinslee said he did—forged her signature to the reinstatement form. Attached to her complaint was a piece of notebook paper with the following handwritten admissions: Walker "signed Kinslee Hancock's name on a conservation form to put her policy back on draft" and was "responsible for all of the problems with Kinslee's policy."

## PROCEDURAL HISTORY

¶15. Shortly after the complaint was filed, Liberty National filed its "Motion to Compel Arbitration, Motion to Stay and for Other Relief." It argued Kinslee's claims in her complaint were subject to an arbitration agreement in the life insurance policy.

¶16. In response, Kinslee argued there simply could not be a valid agreement to arbitrate, because her signature was forged on the application reinstating her life insurance policy without her consent.

¶17. A hearing was held on the motion to compel arbitration. The trial court denied the motion, explaining its reasoning in a detailed order. The trial court acknowledged precedent

4

that the law favors enforcement of a *valid* arbitration agreement. But under the unusual facts of this case, the trial court determined "the crux of the dispute . . . is not whether the arbitration provision of the life insurance policy controls when both parties agreed to the contract[.]" While normally signing a contract that required arbitration of "ANY CLAIM ALLEGING FRAUD" might apply, the original contract had been terminated. So to the trial court, the real question was "whether there is a valid contract which binds the parties to arbitration following the allegedly fraudulent reinstatement[.]"

¶18. The trial court held "that the reinstatement following the November 2018 cancellation was never agreed to" by Kinslee, so it "lacks the mutual assent which is a necessary element to a contract[.]" The trial court further ruled that "it would be logically inconsistent to conclude that [Kinslee] would then agree to arbitrate a dispute after her termination, for a reinstatement of a policy *she never agreed to enter*." (Emphasis added).

¶19. The trial court concluded, "[I]t should be equally obvious to the parties that an attempt to compel a non-party . . . to arbitration after the contract had been terminated should fail for lack of an arbitration agreement following the reinstatement of [her] life insurance policy without her agreement therein."

## ANALYSIS

¶20. To determine the validity of a motion to compel arbitration under the Federal Arbitration Act, courts conduct a "two-pronged inquiry." *E. Ford Inc. v. Taylor*, 826 So. 2d 709, 713 (¶9) (Miss. 2002). "The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the

5

arbitration agreement." *Id*.

¶21.    We must address the first prong and consider the issue of whether the parties even agreed to arbitrate to begin with. "To determine whether the parties agreed to arbitration, we simply apply contract law." *Terminix Int'l Inc. v. Rice*, 904 So. 2d 1051, 1055 (¶9) (Miss. 2004). "To have a valid contract, there must be a meeting of the minds of the parties." *King Metal Bldgs. Inc. v. Renasant Ins. Inc.*, 159 So. 3d 567, 573 (¶20) (Miss. Ct. App. 2014). "The elements of a contract are (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *GGNSC Batesville LLC v. Johnson*, 109 So. 3d 562, 565 (¶6) (Miss. 2013) (citation and internal quotation marks omitted).

¶22.    Finally, and critically, "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Rogers-Dabbs Chevrolet-Hummer Inc. v. Blakeney*, 950 So. 2d 170, 176 (¶15) (Miss. 2007) (internal quotation marks omitted).

¶23.    Here, the issue is whether there was a valid contract that forced the parties to arbitrate following the subsequent fraudulent reinstatement of the life insurance policy after the initial life insurance policy had been cancelled. Our analysis focuses solely on the reinstatement and not the original contract between Kinslee and Liberty National, which she cancelled.

¶24.    It is undisputed that Kinslee never agreed to renew her life insurance policy, that contained the arbitration clause, so there was no "meeting of the minds" between the parties,

which is required before a contract is formed. *King Metal Bldgs. Inc.*, 159 So. 3d at 573 (¶20). And the record does not reveal any evidence to dispute Kinslee's allegation that she never agreed to the reinstatement of her insurance policy; indeed, it contains corroborating evidence from the agent who said Kinslee did not agree to have the policy continue.

¶25. The trial court determined "that the reinstatement following the November 2018 cancellation was never agreed to by [Kinslee] Hancock, and, consequently, lacks mutual assent which is a necessary element to a contract under Mississippi law." The trial court held that "once that [original] policy was terminated . . . it would be logically inconsistent to conclude that [Kinslee] Hancock would then agree to arbitrate a dispute after her termination, for a reinstatement of a policy she never agreed to enter." We agree that because there was no contract left to enforce once it was terminated, Kinslee cannot be bound by the terms of a subsequent contract to which her signature was forged. *See Cenac v. Murry*, 609 So. 2d 1257, 1273 (Miss. 1992) (holding "cancellation . . . is prospective and acts to discharge or excuse remaining obligations under an agreement").[1]

¶26. Since Kinslee did not sign the renewal form, the fraud to restart her life insurance policy didn't "arise out of" the original contract. As a matter of fact and law it was subsequent. The trial court was correct to conclude that Kinslee "cannot be compelled to

---

[1] Because there was no meeting of the minds between the two parties, our two-pronged inquiry should end after the first prong. However, even if there was a valid arbitration agreement, it would not successfully pass the second prong. Specifically, "when we are called upon to consider whether legal constraints exist external to the agreement which might invalidate the arbitration provisions, the existence of fraud in the formation of the contract may be considered." *Blakeney*, 950 So. 2d at 177 (¶15). The admitted forgery by the Liberty National agent results in a void contract.

7

arbitrate her disputes arising from this reinstatement, because she did not agree to have those disputes arbitrated."

CONCLUSION

¶27. The Supreme Court determined that "a party cannot be required to submit to arbitration any dispute which [s]he has not agreed so to submit." *Blakeney*, 950 So. 2d at 176 (¶15). We find that because the reinstatement of the life insurance policy was never agreed to by Kinslee Hancock, there was no contract in existence to enforce. Accordingly, we affirm the trial court's order denying the motion to compel arbitration and remand for further proceedings.

¶28. **AFFIRMED AND REMANDED.**

**CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE AND SMITH, JJ., CONCUR. EMFINGER, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., WILSON, P.J., AND GREENLEE, J.**

**EMFINGER, J., DISSENTING:**

¶29. Kinslee Hancock voluntarily entered into the contract for life insurance on August 12, 2018. Because this contract contains an arbitration provision that covers all the claims made by Hancock in her complaint, including fraud in the reinstatement of the policy, I respectfully dissent.

¶30. Walker and Rogers approached Hancock in August 2018 and asked her to apply for a life insurance policy with Liberty. According to Hancock, Walker and Rogers asked her to apply for the policy as a favor to help them by "adding more premiums and contracts to their account." Walker promised her that it would cost her nothing because he would

8

reimburse her for the cost of the premiums and that the policy would be active for four months. As a result of these representations, on August 12, 2018, **Hancock voluntarily joined Walker's scheme** and applied her electronic signature to the insurance application and supporting documents. These supporting documents included an authorization to draft her bank account for the premiums and an "Acknowledgment of Arbitration Agreement." This acknowledgment stated, in part:

> I have read this statement. I understand that I am voluntarily surrendering my right to have any dispute between Liberty National Life Insurance Company/United Investors Life Insurance Company (U1565. Ed.06/03) and myself resolved in court. This means I am waiving my rights to a trial by jury.
>
> I understand that upon receipt of the policy, I should read the arbitration clause contained in the policy(ies) and that I have the right to reject the policy(ies) within five (5) days of the date of delivery if I do not want to accept the requirement of arbitration.
>
> I understand that this same type of insurance may be available through an insurance company that does not require that policy related disputes be resolved by binding arbitration.

The insurance policy that was issued to Hancock contained a two-page arbitration agreement. Hancock did not reject the policy upon receipt, and the record reflects that Hancock's bank account was drafted on at least three occasions in 2018 for the insurance policy premiums. Hancock raised no complaint until Walker failed to reimburse her for all the monthly premiums as he had promised.

¶31.   In November 2018, Hancock advised Walker that she wanted to cancel the life insurance policy. She also called Liberty's national office to notify them about the cancellation. The record indicates that Walker reached out to Hancock through social media

in January 2019, pleading with her to reconsider reinstating the policy. Hancock did not respond to Walker's request, nor did she give him permission to reinstate the life insurance policy. Despite his knowledge of Hancock's desire to cancel the policy, Walker falsified a reinstatement form by forging Hancock's signature, which resulted in the renewal of the policy. Liberty then took the monthly premium payments from Hancock's bank account after she believed that the policy had been canceled.

¶32. Liberty argues on appeal, as it did before the circuit court, that the original life insurance policy issued to Hancock on August 12, 2018, was a valid and enforceable contract. It contends that Hancock's claims fall squarely within the parameters of the arbitration agreement contained in this contract. Additionally, Liberty argues that Hancock has no contractual defenses to the enforceability of the arbitration agreement contained in the August 12, 2018 contract. In *East Ford Inc. v. Taylor*, 826 So. 2d 709, 713 (¶¶9-10) (Miss. 2002), the Mississippi Supreme Court held:

> In determining the validity of a motion to compel arbitration under the Federal Arbitration Act, courts generally conduct a two-pronged inquiry. The first prong has two considerations: (1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement. . . . Under the second prong, applicable contract defenses available under state contract law such as fraud, duress, and unconscionability may be asserted to invalidate the arbitration agreement without offending the Federal Arbitration Act.

Applying this test, Liberty argues that its motion to compel arbitration should have been granted.

¶33. The circuit court agreed that this original contract was valid when executed by Hancock. The circuit court's order dated April 30, 2021, stated in part:

10

> It appears to this Court, that the crux of the dispute between the parties is not whether the arbitration provision of the life insurance policy controls, when **both parties agreed to the contract in August 2018**, but whether there is a valid contract which binds the parties to arbitration following the allegedly fraudulent reinstatement after the November 2018 cancellation. Likewise it is obvious to this Court that, **had the allegations raised by Hancock only regarded her solicitation and ignorant acceptance of the initial policy agreement in August of that year, then the law would clearly favor arbitration in this cause**.

(Emphasis added). In its order, the circuit court found that there was no evidence to indicate that the August 12, 2018 contract was invalid when executed by Hancock, and further, arbitration would have been favored relative to any claim arising prior to the November 2018 cancellation of the policy. After the circuit court's determination that a valid initial contract existed between Liberty and Hancock on August 12, 2018, the circuit court, and the majority, shift the focus to whether Hancock agreed to reinstate the policy after the policy was canceled by her in November 2018.

¶34. I submit that both the circuit court and the majority have failed to properly apply the test set forth in *East Ford* to the facts of this case. All the parties agree that the August 12, 2018 contract for life insurance was a valid and enforceable contract when executed by Hancock. There has been no question raised as to the validity of the arbitration agreement contained in that contract. The next step, pursuant to *East Ford*, is to determine whether Hancock's claims fall within the scope of this arbitration agreement. *Id*.

¶35. In *MS Credit Center Inc. v. Horton*, 926 So. 2d 167, 175-76 (¶¶24-25) (Miss. 2006), the Mississippi Supreme Court reasoned:

> Courts often characterize arbitration language as either broad or narrow. Broad arbitration language governs disputes "related to" or "connected with"

11

a contract, and narrow arbitration language requires arbitration of disputes that directly "arise out of" a contract.

Because broad arbitration language is capable of expansive reach, courts have held that "it is only necessary that the dispute 'touch' matters covered by [the contract] to be arbitrable."

(Citations omitted). In the case at hand, the arbitration agreement purports to cover:

**ANY DISPUTE, CLAIM QUESTION, OR DISAGREEMENT ARISING OUT OF OR RELATING TO THIS POLICY OR CERTIFICATE. . . . DISPUTES WHICH WILL BE SUBJECT TO THIS AGREEMENT INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING AREAS: INTERPRETATION OF THE POLICY . . . _REINSTATEMENT_; _PREMIUM PAYMENTS_ . . . _AGENT CONDUCT_; ANY CLAIM ALLEGING _FRAUD_, DECEIT, OR SUPPRESSION OF ANY MATERIAL FACT; OR ANY MATERIAL FACT; OR _ANY MATTER ARISING OUT OF OR RELATING IN ANY WAY TO THIS POLICY_**

(Emphasis added). Not only does the arbitration agreement in the August 12, 2018 policy include the broad "relating to" language discussed in _MS Credit Center_, but the agreement also specifically mentions many of Hancock's claims including reinstatement, premium payments, fraud,[2] and agent conduct. This broad language, **agreed to by the parties**, clearly anticipates, and intends to cover claims that arise where the policy has been canceled and then reinstated, whether fraudulently or otherwise.

¶36. The issue we must decide is not whether there was a "meeting of the minds" as to the reinstatement of the policy, as suggested by the majority. Clearly there was not. There was, however, a "meeting of the minds" that resulted in the formation of the August 12, 2018 life

---

[2] Because the complaint's allegations of fraud are not specifically directed only toward the agreement to arbitrate, Hancock's claims of fraud would be properly submitted to the arbitrator for decision. _See Virginia College LLC v. Blackmon_, 109 So. 3d 1050, 1054 (¶11) (Miss. 2013).

insurance contract. The real issue is whether Hancock's claims fall within the scope of the arbitration provisions she agreed to as a part of that contract. I would find that Hancock's claims are covered in by the arbitration agreement of the August 12, 2018 contract, which she voluntarily entered into with Liberty.

¶37. Once we find that there is a valid arbitration agreement and that Hancock's claims fall within the scope of the agreement, the next step in the *East Ford* analysis is whether there are contractual defenses that would preclude enforcement of the arbitration agreement. *East Ford Inc.*, 826 So. 2d 713 at (¶10). While Hancock alleges fraud related to the reinstatement of the insurance policy, she does not assert any such defense to the formation of the initial August 12, 2018 contract.[3] Further, there is no evidence in the record to substantiate any contractual defenses as to the August 12, 2018 contract. As noted above, Hancock's claim that the policy was fraudulently reinstated is clearly among the claims the parties agreed to submit to binding arbitration in the original life insurance contract. Hancock did not meet her burden in proving any contractual defenses to the formation of the August 12, 2018 contract, and this prong of *East Ford* is satisfied. *Id*.

¶38. Because Hancock's claims were covered within the scope of the valid arbitration agreement and because Hancock offered no evidence in support of any contractual defenses,

---

[3] While the majority seems to agree that Hancock voluntarily executed the documents that created a valid life insurance contract, it refuses to give effect to the terms of the contract's arbitration clause because she did not agree to the reinstatement of the policy. The majority finds that the admittedly forged reinstatement "voids" the contract. I disagree. Again, there has been no challenge to the formation of the August 12, 2018 contract. The reinstatement issue is not a challenge to the formation of the contract; instead, the question is whether the claim falls within the scope of the arbitration agreement.

I would find that Liberty's motion to compel arbitration should have been granted and that the trial court abused its discretion in failing to do so.

**BARNES, C.J., WILSON, P.J., AND GREENLEE, J., JOIN THIS OPINION.**